[No. B167449. Second Dist., Div. Eight. Dec. 23, 2003.]

EDAMERICA, INC., et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
KWAN JIN JUNG et al., Real Parties in Interest.

**COUNSEL**

Henry M. Lee & Associates and Henry M. Lee for Petitioners.

No appearance for Respondent.

Lim, Ruger & Kim, Brian K. Sheldon and Nicolas Orihuela for Real Parties in Interest.

## OPINION

### BOLAND, J.—

### INTRODUCTION

■ In landlord-tenant transactions, "key money" is generally considered an up-front bonus payment made by the tenant in order to secure the tenancy.[1] In January 2002, Civil Code section 1950.8, subdivision (b), made it unlawful for any person "to require, demand, or cause to make payable any payment of money, including, but not limited to, 'key money,' . . . as a condition of initiating, continuing, or renewing a [commercial] lease or [nonresidential] rental agreement, unless the amount of payment is stated in the written lease or rental agreement."[2]

■ The issue presented in this case is whether a landlord may be liable for simply demanding "key money" as a condition of extending or renewing an existing lease or rental agreement, even when the tenant rejects the demand and the parties do not enter into the desired new agreement. Based upon the legislative intent behind section 1950.8, we hold it is not unlawful for a landlord to merely make a demand for "key money." Rather, in order for liability to attach under the statute, a plaintiff must allege that the landlord (1) made a demand for "key money" as a condition of initiating, continuing or renewing a lease or rental agreement, and (2) failed to state the amount of the demanded payment in the resulting written lease or rental agreement between the parties.

### FACTUAL AND PROCEDURAL BACKGROUND

Yeng Pil Ji and Kyong Ji own Edamerica, Inc., through which they operate a Korean restaurant in Los Angeles. The Jis operate their restaurant on commercial property under a 1995 written lease with Kwang Jin Jung and Min Ja Jung, the owners of the property. In their second amended complaint against the Jungs and the Jungs' agent, the Jis alleged that on several occasions between December 2001 and March 2002, they asked the Jungs to issue a new lease or extend the existing lease to allow them to sell their business. Each time, the Jungs responded they would not grant a new lease or extend the existing lease unless the Jis first paid $1 million. The Jungs allegedly were aware the Jis had invested over $300,000 in tenant improvements and would be unable to sell their business without a renewed or extended lease because of the limited term remaining on the lease.

---

[1] See, e.g., Note, *Are Landlords Being Taken by the Good Cause Eviction Requirement?* (1988) 62 So.Cal. L.Rev. 321, 360 and footnote 208; Natsis, *When Lease Is More* (Jan. 23, 2001) Los Angeles Lawyer, 46, 51.

[2] All future statutory references are to the Civil Code.

The Jis further alleged that in March 2002, they received an offer to purchase their business, but the offer was contingent upon the new buyer receiving an assignment of a new lease or an extension of the existing lease. The Jungs allegedly refused to issue a new lease or extension unless they were paid $980,000. The Jis alleged each of the Jungs' demands for "key money" was unlawful under section 1950.8, and they lost the offer to purchase their business, and sustained other losses, as a result of the Jungs' violation of this statute. They sought a civil penalty of $3.3 million, representing three times the amount they would have received from their buyer had they received an extended or renewed lease without a "key money" demand.

The Jungs demurred, arguing that section 1950.8 is violated only when a demand for "key money" is not memorialized in the negotiated lease. In other words, the phrase "unless the amount of payment is stated in the written lease or rental agreement" refers to a future lease the parties have yet to enter into. Because they never entered into the new lease or agreement the Jis desired, the Jungs asserted that they could not be held liable solely for making a demand for "key money." In contrast, the Jis argued a demand for "key money" was sufficient to violate the statute if the amount of the payment was not stated in the existing lease, or in a future lease.

The trial court sustained the demurrer without leave to amend. The court agreed with the Jungs because "there is no liability under Civil Code Section 1950.8 when a landlord merely demands in advance of a lease renewal an increase in the amount of rent or a lump sum payment. What is prohibited by the statute is [] the failure to include any such payment in the new written lease. Because no new lease was entered into, no violation could occur as a result of the demand."[3]

The Jis challenged the ruling by filing a petition for a writ of mandate in this court. Generally, writ review is not employed for rulings on pleadings. (See *Babb v. Superior Court* (1971) 3 Cal.3d 841, 850 [92 Cal.Rptr. 179, 479 P.2d 379].) Nonetheless, we issued an alternative writ because section 1950.8 is a newly enacted statute that has not yet been interpreted or applied by any appellate court. (See *ibid.*; *Omaha Indemnity Co. v. Superior Court* (1989) 209 Cal.App.3d 1266, 1269–1270 [258 Cal.Rptr. 66].)

---

[3] The trial court addressed and ruled upon other allegations and causes of action asserted in the Jis' complaint that are neither relevant to nor raised in this writ proceeding.

## DISCUSSION

### 1. *Standard of Review.*

■ When a demurrer is sustained without leave to amend, we determine whether the complaint states facts sufficient to constitute a cause of action and whether there is a reasonable possibility any defect can be cured by amendment. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

We interpret the challenged statute de novo as a matter of law. (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856].) "Our fundamental task in construing a statute is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute. [Citation.] We begin by examining the statutory language, giving the words their usual and ordinary meaning. [Citation.] If there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language governs. [Citations.] If, however, the statutory terms are ambiguous, then we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] In such circumstances, we ' "select the construction that comports. most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." [Citation.]' [Citations.]" (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].)

### 2. *Statute.*

■ Section 1950.8, which became law in January 2002, expressly applies "only to commercial leases and nonresidential tenancies of real property." (§ 1950.8, subd. (a).) Subdivision (b) provides, "It shall be unlawful for any person to require, demand, or cause to make payable any payment of money, including, but not limited to, 'key money,' however denominated, or the lessor's attorney's fees reasonably incurred in preparing the lease or rental agreement, as a condition of initiating, continuing, or renewing a lease or rental agreement, unless the amount of payment is stated in the written lease or rental agreement." According to subdivision (b), "key money" includes any amount of money a landlord demands or requires in order to initiate, continue, or renew a lease, including money denominated as "rent."

A violation of this subdivision subjects a person to a "civil penalty of three times the amount of actual damages proximately suffered by the person seeking to obtain the lease or rental of real property," as well as an award of

costs, including reason ableattorney's fees, incurred in connection with obtaining the civil penalty. (§ 1950.8, subd. (c).)

The statute does not "prohibit the advance payment of rent, if the amount and character of the payment are clearly stated in a written lease or rental agreement." (§ 1950.8, subd. (d).) The statute also does not "prohibit any person from charging a reasonle amount for the purpose of conducting reasonable business activity in connection with initiating, continuing, or renewing a lease or rental agreement for nonresidential real property, including, but not limited to, verifying creditworthiness or qualifications of any person seeking to initiate, continue, or renew a lease or rental agreement for any use other than residential use, or cleaning fees, reasonably incurred in connection with the hiring of the real property." (§ 1950.8, subd. (e).) Additionally, the statute does not "prohibit a person from increasing a tenant's rent for nonresidential real property in order to recover building operating costs incurred on behalf of the tenant, if the right to the rent, the method of calculating the increase, and the period of time covered by the increase is stated in the lease or rental agreement." (§ 1950.8, subd. (f).)

3. *Section 1950.8 Requires Statement of Key Money Demands in Prospective Lease.*

The words of section 1950.8, subdivision (b), which are far from clear, indicate a landlord is subject to liability if that person demands, requires, or causes to make payable a "key money" payment as a condition of initiating, continuing, or renewing a lease or rental agreement. But the statute then provides that the landlord is not liable if "the amount of payment is stated in the written lease or rental agreement." Thus, no violation of section 1950.8 occurs where a prospective or existing tenant agrees to pay the demanded "key money" and the amount of the payment is stated in the parties' new lease or agreement. Whether the lease or agreement initiates a new lease or renews or extends an existing one, no liability results if "the amount of payment is stated in the written lease or rental agreement." Under this scenario, the parties' new lease or agreement would become "the written lease or rental agreement" described in the last portion of the statute.

But what if, as in this case, the tenant rejects the landlord's demand, the parties fail to prepare and execute the desired lease or agreement, and no payment is made? Does the landlord become liable simply because he or she demanded "key money" as part of the parties' negotiation of the desired lease? Furthermore, what if, as in this case, the parties have an existing lease that does not state the amount of any "key money" payment? Does the landlord become liable if, at some point before the end of the lease term, he or she requires a "key money" money payment as a condition of a renewed lease?

This inquiry focuses on the meaning of the words "unless the amount of the payment is stated in the written lease or rental agreement." As they did before the trial court, the Jungs contend the words refer to "the written lease or rental agreement" that results from the parties' negotiation for a new, continued, or renewed lease or agreement. If the parties are unable to agree and no new agreement and payment results, no liability can attach for simply making the demand for "key money." In short, the Jungs argue that the prohibition is the failure to include the amount of the payment in the new lease or agreement. Essentially, this was the trial court's interpretation.

In contrast, the Jis argue that "the written lease or agreement" refers to an existing or future lease. They contend that if a landlord demands "key money" in order to continue or renew an existing lease that omits the amount of the "key money" payment, as with their lease, the landlord is liable for making the demand even if there is no new agreement continuing or renewing the lease and no "key money" is paid.

■ Because section 1950.8 allows a demand for payment of "key money" as long as "the amount of payment is stated in the written lease or rental agreement," the Legislature apparently did not intend to discourage the practice of demanding or collecting "key money" as a condition of a new or renewed lease. Indeed, based upon the statutory language, any other conclusion would lead to absurd consequences, which are to be avoided. (*Day v. City of Fontana, supra,* 25 Cal.4th at p. 272.) For example, assume a landlord negotiates with two prospective tenants who desire the same property and the landlord makes "key money" demands on both. The tenant who secures the lease that includes a provision memorializing the payment of the " key money" would have no claim against the landlord because the demand is "stated in the written lease" and, hence, complies with the statute. In contrast, the unsuccessful prospective tenant would be able to assert a claim against the landlord simply because he or she rejected the demand. We do not believe the Legislature intended such an anomalous result. We must conclude, therefore, the statute was not meant simply to prohibit the practice of demanding or collecting "key money."[4]

■ The Jis argue the Jungs were not allowed to demand "key money" because "key money" was not mentioned in their existing lease. We disagree. Because the landlord may lawfully demand and collect "key money,"

---

[4] We cannot ignore the word "demand" in the statute and must endeavor to avoid a construction that would render statutory language superfluous. (*Olsen v. Breeze, Inc.* (1996) 48 Cal.App.4th 608, 624 [55 Cal.Rptr.2d 818].) Our decision and the statute are easily reconcilable. If, as part of the negotiation process, a landlord makes a "key money" demand and presents the prospective tenant with a proposed lease or rental agreement, the document must include the "key money" term demanded.

the object of the statute must be to prohibit landlords from failing to state the amount of the payment "in the written lease or rental agreement" that is the product of the demand. We believe "the written lease or rental agreement" in the last portion of section 1950.8, subdivision (b) refers back to the "lease or rental agreement" concerning which the landlord demands "key money" "as condition of initiating, continuing, or renewing." In other words, "the written lease or rental agreement" refers to the lease or agreement for the new period to which the demand applies. Therefore, once a demand for "key money" is made, the landlord becomes obligated to include the amount of the payment in the desired future agreement, whether that agreement initiates a new tenancy or renews an existing one.

Nonetheless, because the ultimate purpose of section 1950.8 is unclear, we must test our interpretation against its legislative history. (See *Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1205 [31 Cal.Rptr.2d 776, 875 P.2d 1279] [courts may turn to legislative history when the words of the statute do not provide a ready answer of the Legislature's intent]; *Day v. City of Fontana*, *supra*, 25 Cal.4th at p. 274 [a court may, out of an undance of caution, test its statutory interpretation against its legislative history].)

### 4. *Legislative History.*

According to an August 21, 2001 Senate Judiciary Committee report, Assembly Bill No. 533 was intended to "prohibit landlords of commercial property from charging or collecting any 'keying fee' or other fee unless that fee amount is 'ascertainable' in the commercial lease agreement. . . . [¶] This bill is intended to address the problem of some landlords in the tight Los Angeles commercial or industrial lease market demanding, mostly under-the-table, a 'keying fee' as a condition of beginning or renewing a commercial lease. This bill would not prohibit the practice, but would only allow its collection if its charge is 'ascertainable' in the lease agreement." (Sen. Com. on Judiciary, com. on Assem. Bill No. 533 (2001–2002 Reg. Sess.) as amended June 25, 2001, p. 1.)[5]

The report further states, "The author [of the bill] states that 'key money' is a practice used by unscrupulous landlords who verbally demand tens to hundreds of thousands of dollars, usually in cash, as a condition of initiating or renewing a commercial lease. The practice is practically prevalent in the

---

[5] As amended on June 25, 2001, the bill used the phrase "unless the amount of payment is ascertainable from the terms of the written lease or rental agreement." The bill was later further amended to require, as it does currently, that the amount of the payment be "stated in the written lease or rental agreement" in order to make clear that the amount of the payment "is there for people to see" and not simply "there for people to deduce . . . ." (Sen. Com. on Judiciary, com. on Assem. Bill No. 533, *supra*, pp. 4–5.)

downtown Los Angeles fashion district, where it has been an underground practice for over 30 years. [¶]. . . . The fierce competition for space in the fashion district has resulted in garment wholesalers having to pay for soaring rental rates, in addition to costs, such as 'keying fees,' not formally included on a standard lease form. . . . [¶] Partially because of the lack of legal sophistication, and partially because of the lack of options in a take-it or leave-it situation, prospective and current tenants in the fashion district do not challenge the underground practice of paying key money in cash. Proponents assert that Assembly Bill No. 533 will put an end to the extortion and intimidation, and provide better consumer protection against this predatory behavior. However, it should be noted that Assembly Bill No. 533 would not bar the practice of demanding and collecting 'key money,' but would condition the validity of its collection on the fee being 'ascertainable' from the terms of the lease agreement." (Sen. Com. on Judiciary, com. on Assem. Bill No. 533, *supra*, at pp. 2–3.)[6]

The legislative history indicates the intended purpose of section 1950.8 was not to eliminate demands or collection of "key money." Rather, the purpose was to eliminate the prevalent "underground" or "under-the-table" pressure tactic used by some landlords of requiring cash payments of "key money" that are not reflected in the formal written lease. In short, the aim of the statute appears to be the prospective documentation of the demanded "key money" payment.

The legislative history confirms our view that "the written lease or rental agreement" refers to the lease or agreement for the new period to which the demand applies. If the demand for "key money" is made "as a condition of initiating . . . a lease or rental agreement," the new written lease or agreement must state the amount of the payment. Likewise, if the demand for "key money" is made "as a condition of . . . renewing a lease or rental agreement," the renewed written lease or agreement must state the amount of the payment. Failure to state the amount of the payment in the new lease or agreement subjects the landlord to liability.

## 5. *Conclusion.*

Based upon our construction of section 1950.8 and its legislative history, we conclude that in order to state a cause of action under section 1950.8, subdivision (b), a plaintiff must allege that the landlord (1) made a demand on the plaintiff for "key money" as a condition of initiating,

---

[6] An Assembly report noted "key money" payments "don't show up in lease documents and are often requested in cash," "tenants don't challenge the underground practice of paying 'key money' in cash," and some " 'suspect it's a tax dodge for some landlords who, some merchants claim, pressure them to pay in cash and don't provide receipts.' " (Assem. Com on Judiciary, com. on Assem. Bill No. 533 (2001–2002 Reg. Sess.) as amended Mar. 26, 2001, pp. 2–3.)

continuing or renewing a lease or rental agreement, and (2) failed to state the amount of the demanded payment in the resulting written lease or rental agreement between the parties.

In their second amended complaint, the Jis alleged the Jungs demanded "key money" as condition of renewing or extending their current long-term lease. However, they did not allege a failure to state the amount of the demanded payment in the resulting written lease or rental agreement between the parties. Indeed, they affirmatively alleged they lost the opportunity to sell their business because the Jungs would not renew or extend the lease without a payment of "key money." Because the Jis did not and cannot allege the Jungs failed to state the amount of the demanded payment in a new written lease or agreement, we conclude the trial court did not err in sustaining the demurrer without leave to amend.

## DISPOSITION

The petition is denied. The Jungs are to recover their costs.

Cooper, P. J., and Rubin, J., concurred.

Petitioners' petition for review by the Supreme Court was denied March 24, 2004. Kennard, J., was of the opinion that the petition should be granted.