Filed 4/7/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| OLYMPIC AND GEORGIA PARTNERS, LLC,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>COUNTY OF LOS ANGELES,<br><br>    Defendant and Appellant. | B312862<br><br>Los Angeles County<br>Super. Ct. No. BC707591 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Malcolm H. Mackey, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Greenberg Traurig, Charles Stephen Davis and Colin W. Fraser for Plaintiff and Appellant.

KJM Law Partners, Kevin J. Moore and Evan T. Chavez for California Alliance for Taxpayer Advocates as Amicus Curiae on behalf of Plaintiff and Appellant.

Renne Public Law Group, Michael K. Slattery, Thomas G. Kelch, and Imran M. Dar for Defendant and Appellant.

————————————

Tax assessors sometimes appraise commercial property using the income method: they forecast yearly income the property will yield and discount the future stream to present value. This method requires assessors to subtract income fairly ascribed to *intangible* assets, including those directly necessary to the productive use of the property. (*Roehm v. Orange County* (1948) 32 Cal.2d 280, 285 (*Roehm*); *Elk Hills Power, LLC v. Board of Equalization* (2013) 57 Cal.4th 593, 614–615, 617–619 (*Elk Hills*).)

Defendant and appellant County of Los Angeles violated the *Roehm* and *Elk Hills* rules. The County incorrectly assessed a hotel owned by the protesting taxpayer, Olympic and Georgia Partners, LLC (Olympic). The County's assessor erroneously included income from three intangibles: a subsidy; a discount; and some hotel enterprise assets.

We reverse the portion of the judgment concerning the subsidy and the discount. Regarding the hotel enterprise assets, we affirm the trial court's remand of the case to the County's Assessment Appeals Board (Board) for re-evaluation. We remand the issue of fees and costs to the trial court.

I

We begin by describing the three disputed items: the subsidy, the discount, and the hotel enterprise assets. Then we recount the case's history.

A

The items in dispute are the $80 million subsidy, the $36 million discount, and the $34 million hotel enterprise assets. All figures, now and later, are in round numbers.

2

The $80 million subsidy was from the City of Los Angeles to Olympic.

The *City* of Los Angeles is different from the *County* of Los Angeles, which is the defendant and appellant here. The City was deeply involved with this hotel project from the start—indeed, the hotel was the City's brainchild—but the City is not a party to this County tax case.

Last century, the City decided its downtown convention center was uncompetitive in the national market because it lacked an adjoining convention hotel: a nearby place with 1,000 rooms for conventioneers. The City figured a large hotel project in this location would be publicly beneficial but privately uneconomic: that it would yield extensive municipal benefits, but that no private developer would go it alone because the cost would outweigh the private payoff. So the City agreed to pay Olympic a monthly subsidy to build this tall convention hotel, which today is a feature of the downtown skyline.

The subsidy is a function of the room tax the City charges hotel guests. The City agreed to give to Olympic the room tax the City collects from Olympic's guests, subject to certain restrictions. The County calculated the subsidy's present value was $80 million.

Over Olympic's protest, the County added this $80 million figure to the hotel's assessment. The Board affirmed this treatment, as did the trial court.

The second item is the $36 million discount.  Olympic owns the hotel but decided to get someone else to manage it, so Olympic contracted with two established hoteliers to hire staff, to set rates, and to run the place day to day.  These two hoteliers are Ritz-Carlton and Marriott.  Each operates a different part of Olympic's building.  The public perceives two hotels—one of each brand—but the two are contiguous and Olympic owns them both, so we refer to "the hotel."

Owner Olympic agreed to pay hotel managers Ritz-Carlton and Marriott for their management services.

Obviously, it is a big effort to run a 1,000-room hotel successfully.  But it is also obvious there could be a sizable profit potential from this large venture if you get the contract on good terms, if market conditions are favorable, and if you are efficient.  The lawyerly contract governing this arrangement is some 90 pages long and later amendments make the whole thing even longer.  But, for our purposes, the contractual essence is simple: owner Olympic promised to pay managers Ritz-Carlton and Marriott to run the hotel, and they promised to do a first-rate job.  The record contains no complaints about the quality or success of the whole operation.

This deal has Olympic paying the managers a percentage of the hotel's gross revenues and cash flows.  The details do not matter here.  The thrust is that money flows over time from Olympic to the managers in return for the managers' continuing service of running the hotel.

The controversy is about a one-time up-front payment of $36 million the managers paid *to Olympic*. The parties' jargon for this payment is "key money." In the main, we forsake their jargon in favor of the economic substance of the item: it is a *discount*. The bulk of the money flows from owner Olympic to managers Ritz-Carlton and Marriott over time, so the logical way to think of the up-front, one-time $36 million payment going the other way is as a discount the managers paid to secure their deal with Olympic—like a cash rebate a dealer gives to prompt a car sale on credit. It is a sweetener, a price break: a discount.

The question is whether a management company's discount to a hotel owner is "income" an assessor should attribute *to the hotel*. The County and the trial court said yes.

3

The third item is a collection of three hotel enterprise assets that Olympic valued at $34 million. The assessor and the Board declined to subtract any of the $34 million. To set out the controversy, we describe this item's three components: flag and franchise, food and beverage, and assembled workforce.

"Flag and franchise" refers to the intangible benefits flowing to Olympic from its deals with Ritz-Carlton and Marriott. The benefits include, for instance, the general customer goodwill accompanying these trademarks, together with Olympic's access to these hoteliers' worldwide marketing systems, toll-free numbers, reservation systems, websites, and loyalty programs. Olympic likewise gained advantages from their experience and expertise in recruiting and training a workforce. Ritz-Carlton and Marriott also gave Olympic covenants not to compete in the

5

vicinity. Olympic's analysis was that flag and franchise should be valued at $17 million.

"Food and beverage operations" denotes the hotel's two restaurants—each affiliated with a different and professedly prominent chef—as well as a pool bar, 24-hour in-room dining, and banquet operations. The revenue from these sources is separate from room revenue. A large percentage comes from people who merely visit the hotel for a drink or to dine. Olympic proposed a present value of $13 million for the intangible asset flowing from these operations.

"Assembled workforce" signifies the intangible benefits Olympic gets from the more than 800 trained people employed at the hotel. Employers suffering strikes understand the value of good labor relations. The employee turnover rate at Olympic's hotel was below average: about 33 percent in 2010 (the first year of operation, and a partial year), 20 percent in 2011, 17 percent in 2012, and 12 percent in 2013. This low and downward trend contrasted with a 2001 survey of 98 hotels (not including Olympic's) that showed other hotels had an average workforce turnover rate every six months of *47 percent*. (Simons & Hinkin, *The Effect of Employee Turnover on Hotel Profits: A Test Across Multiple Hotels* (Aug. 2001) Cornell Hotel and Restaurant Administration Quarterly, 65, 67.) The authors of the 98-hotel survey found lower employee turnover rates confer financial benefits because lower rates reduce the costs of recruiting, interviewing, and training. (*Id*. at p. 66.) The savings were greater for hotels with higher room rates. (*Id*. at pp. 67-68.) Olympic valued this intangible at $4 million.

6

B

We summarize the case's history and posture.

This big hotel project was in the works for a long time. The City got an environmental impact report for its hotel plan in 2001. Olympic entered the picture in 2007 through contracts with the City and with Ritz-Carlton and Marriott. Once Olympic completed construction, the County sought to value the new building and to levy property taxes upon it.

Olympic argued the assessor should subtract from the hotel's assessment the $80 million, $36 million, and $34 million sums just set forth. The County disagreed, and Olympic brought the dispute to the Board. The parties could not agree on the right way to treat the first two numbers. The third number was the $34 million for the hotel enterprise assets, and on this issue Olympic supported its claim with an analysis by its expert on business valuation, Mary O'Connor. O'Connor submitted her credentials, which included her past work of this kind for many other companies. She relied on established appraisal methods and authorities to identify and value these intangibles. She presented worksheets and documents to verify the existence of, and the value applied to, these intangibles. O'Connor added up $17 million, $13 million, and $4 million to get a total of $34 million for the hotel enterprise assets.

Olympic maintained the *Roehm* and *Elk Hills* decisions required the Board to exclude the three disputed items from the hotel's value.

The Board rejected Olympic's request.

Regarding the subsidy, the Board ruled it would include the $80 million because it was "an intangible asset of real property that runs with the land and is associated with ownership of the property."

The Board refused to deduct the $36 million discount, which the parties called key money. The Board reasoned the $36 million was "a payment received in exchange for a tangible right in real property." It was "a valuable income component of the property, that runs with the land and should be included in the valuation of the property."

As to the hotel enterprise assets, the Board devoted four sentences to its analysis of the issue:

*[The Board] finds that the intangibles relating to the Flag and Franchise as well as the Workforce in place are the property of [Ritz-Carlton and] Marriott, not of [Olympic]. [Olympic] has a right to use them as long as they maintain the Management Contract. The Board is not persuaded by the valuation of these intangibles by [Olympic] and believes there is no compelling evidence to isolate the potential Flag and Franchise and Workforce value from the real estate value. As for the last intangible identified by [Olympic], [i.e.], the Food and Beverage business value, the Board does not find the rents or income used in [Olympic's] analysis a reliable [indicator] of the level of income and expense to be allocated to the food and beverage business.*

Olympic took the matter to the superior court, which held a bench trial and heard closing arguments in 2021. The court did not issue a statement of decision, but its judgment ruled the Board was right to include the subsidy and discount in its

valuation. As to the hotel enterprise assets, the judgment remanded this issue for the Board to determine and deduct these sums. The court ordered all sides to bear their own costs and fees.

Olympic and the County both appealed the adverse portions of the judgment.

## II

We summarize our holding. The County erred by including the subsidy and the discount. We reverse the judgment on those items. The County also erred by including the value of the hotel enterprise assets. The trial court correctly remanded this issue to the Board. We remand the fee and cost issue to the trial court.

## A

We review the pertinent law in three steps.

### 1

The modern law of California property taxation began when Justice Roger Traynor wrote the *Roehm* opinion.

Before appointment to the bench, Justice Traynor had been a nationally recognized tax expert, tax scholar, and tax administrator. As a professor, he wrote some *20* law review articles about taxation. In the era of the Great Depression, Professor Traynor served not only as a tax scholar but also as a tax advisor, a tax legislative draftsman, and a tax administrator during a crisis period for tax policy. (White, The American Judicial Tradition (3d ed. 2007) pp. 262–263; Johnson, History of the Supreme Court Justices of California, Vol. 2, 1900-1950 (1966) pp. 182, 184, 187–189, 191–192, 194–195.)

With his *Roehm* opinion, Justice Traynor laid the foundation for modern California law on property taxation.

*Roehm* established that the government's power to impose property taxes turned on whether the property was tangible or intangible. Governments within the state could tax tangible property directly. But the only forms of intangible property these governments could tax directly were (1) notes, (2) debentures, (3) shares of capital stock, (4) bonds, (5) solvent credits, (6) deeds of trust, and (7) mortgages. (*Roehm*, *supra*, 32 Cal.2d at pp. 284–285; see Cal. Const., art. XIII, § 2 [authorizing property taxes on these seven intangibles].)

This list of seven intangibles stemmed from historical roots that Professor Traynor had traced before his appointment to the bench. (See Traynor, *National Bank Taxation in California* (1929) 17 Cal. L.Rev. 456, 474-478, 490, fn. 105.)

Apart from these seven intangibles, according to *Roehm*, all other intangibles are "immune" from direct property taxation. (*Roehm, supra*, 32 Cal.2d at p. 285.)

Justice Traynor's opinion gave the logic for California's fundamental distinction between tangible and intangible property. Experience showed attempts to tax intangible property had produced more "concealment of intangible assets" than revenue for the public fisc. (*Roehm, supra*, 32 Cal.2d at p. 287.)

As support, Justice Traynor cited a book by Professor Edwin Seligman of the Columbia Law School. (*Roehm, supra*, 32 Cal.2d at p. 287 [citing Seligman, Essays in Taxation (10th ed. 1925) (Seligman)].) Seligman's book recounted that, "especially where the taxpayers are required to fill out under oath detailed blanks covering every item of their property, the inducements to perjury are increased so greatly as to make its practice universal. . . .

10

Official documents tell us that 'instead of being a tax upon personal property, it has in effect become a tax upon ignorance and honesty.'" (Seligman at p. 27.) This system of taxing intangibles was "'debauching to the conscience and subversive of the public morals—a school for perjury, promoted by law.'" (*Ibid* [citing the Illinois Report of the Revenue Commission (1886) p. 8].)

For this reason, California forbade direct taxation of intangible property, apart from the list of seven assets.

*Roehm*'s specific holding was the County of Orange could not impose a direct property tax on a liquor license because the license was intangible property that was not on this list. (*Roehm, supra*, 32 Cal.2d at p. 290.)

2

The second major doctrinal step was *GTE Sprint Communications Corp. v. County of Alameda* (1994) 26 Cal.App.4th 992, 1004, 1007 (*GTE*).

In *GTE*, a county assessor valued a company, and the trial court affirmed the assessment. (*GTE, supra*, 26 Cal.App.4th at pp. 997–1000.) The *GTE* appellate court reversed because the county had ignored GTE's evidence of intangible assets and had assumed "without adequate explanation" that the assessor's methods automatically had appraised only the enhancement value of those intangible assets. (*Id.* at p. 1001.) GTE's own experts had reasonably established the existence of intangible assets as part of the company's value. These intangibles included trademarks, a customer base, an assembled workforce, and the goodwill associated with a going concern. (*Id.* at p. 998.)

11

As they had for many other companies, GTE's expert witnesses relied on established appraisal methods and authorities to identify and value these intangible assets. The experts presented worksheets and documents to establish the existence and value of these intangibles. (*GTE*, *supra*, 26 Cal.App.4th at p. 1003.) Yet the county dismissed all that "without adequately addressing" GTE's evidence. (*Ibid.*) The county's view, with our emphasis, was simply that, " '[u]nder California law, the income attributable to tangible property can be *enhanced* by the existence of intangibles.' " (*Id.* at p. 1004.) But the *GTE* opinion held that "[t]his absolutist approach obscures the [assessor's] duty to exclude intangible assets from assessment." (*Ibid.*) Thus, a county's assessment must adequately address the taxpayer's "credible" evidence of intangible valuation. (*Id.* at p. 999.)

In 2013, the Supreme Court wrote *GTE* into Supreme Court law by citing it seven times in its *Elk Hills* decision. (See *Elk Hills*, *supra*, 57 Cal.4th at pp. 604, 606, 610, 613, 615, 619 [citing *GTE*].)

3

The third and most recent step in the development of the governing law was the 2013 *Elk Hills* decision itself, which tackled an apparent contradiction within California tax law. With our emphasis, one part of that law directed that "assessors may *not* include the value of intangible assets and rights in the value of taxable property." (*Elk Hills*, *supra*, 57 Cal.4th at p. 601 [citing Cal. Const., art. XIII, § 2; Rev. & Tax. Code, §§ 110, 212].) Another part, however, seemed to give assessors liberty to *assume* the presence of intangible assets necessary to put the taxable

property to beneficial or productive use.  (*Elk Hills* at p. 602 [citing § 110, subd. (e)].)

The *Elk Hills* court resolved this apparent contradiction in the treatment of intangible assets necessary to the productive use of taxable property by holding that, when using the income method to ascertain property value, assessors must quantify and subtract income fairly ascribed to such assets.  (*Elk Hills*, *supra*, 57 Cal.4th at pp. 614–615, 617–619.)

Applying this rule, the assessor won on this issue in *Elk Hills* because that taxpayer could not articulate a basis for attributing a separate stream of income to its intangible asset.  (*Elk Hills*, *supra*, 57 Cal.4th at p. 619.)  But in other cases where the taxpayer can fairly value the intangible, assessors must deduct that amount from the final assessment.  (*Id.* at pp. 618–619.)

B

We apply this law to the three assets in this case.  Our review is independent.  (*GTE*, *supra*, 26 Cal.App.4th at p. 1001.)

1

For the $80 million subsidy, *Elk Hills* required the assessor to subtract this sum from the hotel's valuation.  This asset was intangible and capable of valuation.  It directly contributed to the hotel's income stream:  the City pays monies to Olympic based on hotel usage.  It was necessary because without it the hotel would not have been built.  The law thus required the assessor to deduct the $80 million.  (*Elk Hills*, *supra*, 57 Cal.4th at pp. 614–615, 617–619.)

The County argues the Board properly found the subsidy "runs with the land and is associated with ownership of the

13

property." Whether the subsidy runs with the land, however, is not the *Elk Hills* test. Rather, that test is whether the asset is directly necessary to the productive use of the property, whether it is intangible, and whether it can be valued. (*Elk Hills*, *supra*, 57 Cal.4th at pp. 614–615, 617–619.) Where the answer to these questions is yes, as here, then *Elk Hills* requires the deduction.

The County seeks to distinguish *Elk Hills* in three ways. These bottles will not hold water.

First, the County notes the *assessor won* the pertinent part of the *Elk Hills* case. This superficial point overlooks the taxpayer's decisive failure to articulate any basis for valuing the intangible in that case. (See *Elk Hills*, *supra*, 57 Cal.4th at p. 619.) Here we have the opposite: Olympic has articulated this basis for valuation, which the parties agree was $80 million.

Second, the County points out these payments were to, not from, Olympic. By acknowledging Olympic received income from this intangible, however, the County places this case within the *Elk Hills* rule.

Third, the County argues there is no agreement the subsidy is an intangible asset. But the Board did find it was an intangible asset. The County does not argue the subsidy is something tangible you can touch. This argument is ineffective.

2

Moving now to the $36 million discount, the County and the trial court erred by treating it as income to the hotel. The discount was not income *to* the hotel; it was a price break the managers gave the hotel on payments *from* the hotel. When I get a dealer discount for buying a car, the discount is not income to me. My payment is income to the dealer, not the other way

14

around.  The assessor's logic was flawed because discounts are not income.

The County's defense of its decisionmaking is unsuccessful.

The County cites Civil Code section 1950.8, subdivision (b) and *Edamerica, Inc. v. Superior Court* (2003) 114 Cal.App.4th 819, 824, which do not concern property taxation and are not controlling.  The County also argues the discount is "like prepaid rent," but, as pertains to this case, neither Olympic nor the managers rented anything from anyone.

The County next argues the contract gave the managers rights and duties "tied to" the use of the hotel property.  The County offers no case support for its proposed and unprecedented *tied-to-property* test, which fails to address the fact the main management payments go *from* the hotel and not *to* the hotel.

The County cites *Pacific Southwest Realty Co. v. County of Los Angeles* (1991) 1 Cal.4th 155, which held a sale and leaseback changed ownership and triggered reappraisal.  (*Id.* at pp. 159–171.)  There is, however, no sale and leaseback here.  Similarly irrelevant is *Forster Shipbuilding Co. v. Los Angeles County* (1960) 54 Cal.2d 450, 455–456, which held leases are considered real property for purposes of property taxes.  That holding is not germane.

The County argues a hypothetical buyer would pay for the right to key money.  The hypothetical conduct, however, does not alter the fact the $36 million was a discount on income to the managers from the hotel and was not income to the hotel.  This argument has the economics backwards.

15

For good reason, the County does not dispute Olympic's assertion the management agreement is an intangible asset. (See *GTE, supra*, 26 Cal.App.4th at p. 1006.)

3

The third item in controversy is the collection of hotel enterprise assets. The County treated this collection incorrectly: these intangibles directly contributed to the hotel's success and can be quantified.

We explain in more detail.

The county's treatment was in error. Valuation of these intangibles was possible: O'Connor proposed credible values for all three and backed up her estimates with 16 pages of analysis and exhibits. The Board did not engage O'Connor's analysis, method, or data but rather rejected this work without meaningful explanation.

The Board gave two wrong reasons for rejecting O'Connor's valuations. First, Olympic did not own these intangibles; someone else did. Second, the analysis was not "compelling" or "reliable."

The first reason fails. No California law says an assessor can require a taxpayer to pay property tax on an intangible so long as the taxpayer does not own it. The County cites no supporting legal authority for this approach, which offends the rule that intangibles are "immune" from direct property taxation. (*Roehm, supra*, 32 Cal.2d at p. 285.) This first reason is unavailing.

The Board's second reason was O'Connor's analysis was not "compelling" or "reliable." The *GTE* decision disapproved of

16

peremptory dismissals. (*GTE*, *supra*, 26 Cal.App.4th at pp. 995, 999, 1001, 1003–1008.) When the taxpayer offers an apparently credible valuation of the intangibles, as here, the assessor and Board must diligently grapple with this substance. (*Ibid.*) The trial court properly required the Board to ascertain and deduct the value of these intangibles.

The County vainly tries to distinguish *GTE*.

First, "the County makes no claim that all of the value of [Olympic's] intangible assets are taxable 'enhancement' value." Be that as it may, the County still must diligently respond to credible valuation efforts.

Second, the County argues its assessment "identified and completely removed" the value of Olympic's interest in the managers' franchises and workforces because "the deduction of the hotel owner's payment of a franchise fee to an operator like [Ritz-Carlton and] Marriott completely accounts for the value of the franchise affiliation and the associated workforce."

This argument is incorrect. If a franchise fee were so high as to account completely for all intangible benefits to a hotel owner, the owner would have no reason to agree to the franchise deal. The County put an article by Stephen Rushmore in the record, but this article contains no empirical support for the illogical premise that every franchise fee wipes out all intangible benefits a franchise agreement might offer a hotel owner. (Cf. *SHC Half Moon Bay, LLC v. County of San Mateo* (2014) 226 Cal.App.4th 471, 492 [disagreeing with a county's claim that all intangible value was removed by deducting the management and franchise fee].)

17

## C

Olympic argues that, as the prevailing party, it was entitled to costs and fees. Determination of this issue is best suited for the trial court in the first instance. We remand this matter to the trial court.

## DISPOSITION

We reverse the trial court's ruling that the subsidy and key money are taxable as property. We affirm the trial court's order remanding to the Board for valuation and deduction of the flag and franchise, food and beverage, and workforce assets. In recalculating the property assessment, the Board shall exclude the values of the subsidy, the key money, and whatever values it assigns to the flag and franchise, food and beverage, and workforce assets. We remand to the trial court to consider any motions for costs and fees. We award costs on appeal to Olympic. The requests for judicial notice are denied.


WILEY, J.

I concur:



HARUTUNIAN, J.*

---

* Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18

**B312862**
*Olympic and Georgia Partners, LLC v. County of Los Angeles*
**GRIMES, Acting P. J., Dissenting.**

I respectfully dissent from the majority's reversal of the trial court's ruling that the transient occupancy tax and the key money were correctly included as taxable income from the use and operation of the hotel.  The majority invent a new label for the transient occupancy tax payments from the City, worth an estimated $80 million over 25 years, recharacterizing the payments as a "monthly subsidy to build" the hotel.  (Maj. opn. *ante,* at p. 3.)  The majority invent another new label for the $36 million the hotel's managers paid in "key money" at the inception of their relationship with Olympic, recharacterizing it as a "discount."  (*Id.* at p. 5.)  I do not think the majority's new terminology and new concepts correctly describe the categories of income in question, with the result that the majority reaches the incorrect conclusion that these categories of income are not properly included in calculating the base year tax value of the hotel.

In this dissent, I use the majority's terminology for consistency only.  My use is not an endorsement of the judgments the terms imply.

The parties agree it was correct for the County to assess the real property based on the income approach, which estimates the income the hotel could produce under competent management, considering the duration and riskiness of the income stream, divided by a reasonable rate of return, to arrive at the value of the real property, or a capitalization rate (discounted cash flow analysis).  The valuation of hotels presents issues that do not

1

arise with office or other buildings that generate income only from the real property.  Hotel income is derived from the real property *and* a business, and involves income from many sources, including intangibles like a good trade name and an experienced workforce.  For the reasons that follow, I believe that the Board and trial court were correct in concluding that the "subsidy" and "discount" were properly counted as taxable income of the hotel real property for purposes of assessment.

**The Subsidy.**

The subsidy arises from an agreement between the City and the hotel's original developer, L.A. Arena Land Company, LLC.  The purpose of this agreement was to induce the developer to build, on land it owned near the Los Angeles Convention Center, a hotel that would increase use of the convention center.  The City agreed to pay the developer for 25 years the transient occupancy taxes the City collects from hotel guests—the "subsidy"—in exchange for the developer building the hotel.  The City also required that the developer make available up to 750 rooms in the hotel for conventioneers.  The benefits and burdens of this arrangement now inure to Olympic.  The original developer assigned the subsidy rights to Olympic at the same time it sold Olympic the hotel.  As a result, every time a guest rents a room at the hotel, the guest pays a City tax that is ultimately paid to Olympic.

The majority succinctly sum up this arrangement as follows: "the City pays monies to Olympic based on hotel usage." (Maj. opn. *ante*, at p. 13.)  But they lose sight of this reality in their conclusion that the subsidy should be ascribed to the intangible asset—the City's agreement to do so.

2

The majority conclude the subsidy is nontaxable pursuant to *Elk Hills Power, LLC v. Board of Equalization* (2013) 57 Cal.4th 593 (*Elk Hills*). The majority interpret *Elk Hills* as holding that where, as here, taxable real property is assessed using the income method of valuation, income streams directly attributable to intangible assets that are necessary to the property's productive use must be excluded. Based on this interpretation, the majority conclude cash flow from the subsidy must be excluded from the value of the hotel because it was (1) generated by an intangible asset; (2) capable of valuation; and (3) "necessary because without it the hotel would not have been built." (Maj. opn. *ante*, at p. 13.)

I believe the majority misinterpret *Elk Hills*.

The subsidy is income generated by the use of the taxable property, not by an intangible asset. I believe the majority's facile application of the *Elk Hills* income method valuation discussion ignores the *Elk Hills* command to value taxable property based on all earnings of the taxable property or flowing from its beneficial use.

*Elk Hills*'s discussion about adjustments for intangible asset income when valuing taxable property by the income method is found at pages 618 through 619 of the *Elk Hills* opinion. There, the Supreme Court classifies intangible assets into two categories. (*Elk Hills*, *supra*, 57 Cal.4th at pp. 618–619.) The first category is those intangible assets necessary to the productive use of taxable property but which generate no income of their own. The emission credits the *Elk Hills* taxpayer had to buy to operate its taxable powerplant fell into this category. They were necessary to operate the powerplant, but no revenue could be ascribed to the credits. The credits allowed the taxpayer to do business and

3

*thereby* generate income. (*Id.* at p. 619.) But there was no "basis for attributing to [them] a separate stream of income related to enterprise activity, or indeed any separate stream of income at all." (*Ibid*.) Thus, there was no income from the emission credits to deduct from the powerplant's income used to calculate the powerplant's value.

The second category of intangible assets *Elk Hills* identifies is those which "make a direct contribution to the going concern value of the business as reflected in an income stream analysis." (*Elk Hills*, *supra*, 57 Cal.4th at p. 618.) The *Elk Hills* court identifies the following as examples: "the goodwill of a business, customer base, and favorable franchise terms or operating contracts." (*Ibid.*) When performing an income method valuation, their direct contribution to income "has a quantifiable fair market value that must be deducted from an income stream analysis prior to taxation [of the related taxable asset being valued]." (*Id.* at p. 619.) Excluding income from these types of intangible assets was consistent with the *Elk Hills* taxing authority's valuation manual that excluded "income from intangibles related to enterprise activity, such as 'customer base' and 'patents and copyrights.' " (*Ibid.*)

After discussing these two kinds of intangibles, the *Elk Hills* court reaffirmed the fundamentals of income method valuation: "Under the income stream approach, the fair market value of property is based on the projected amount of income that property will earn over its lifetime. [Citation.] When using this approach, ' "[i]ncome derived in large part from enterprise activity [may not] be ascribed to the property being appraised; instead, it is the earnings from the [taxable] property itself or from the

4

beneficial use thereof which are to be considered." ' " (*Elk Hills*, *supra*, 57 Cal.4th at p. 619.)

The majority's analysis of the subsidy ignores this last aspect of *Elk Hills*. In ascribing the income stream (the transient occupancy tax payments) to the intangible asset (the contract between the City and the original developer) and stopping there, the majority ignores this economic reality: The value of the subsidy derives directly from Olympic's use of its taxable property, much like lease payments from a tenant to the landlord derive from the use of the property, not just from the lease agreement. While flowing through a contract that the parties agree is an intangible asset, the value of the subsidy derives directly from the use of the property as a hotel. If the property were not being used as a hotel, there would be no subsidy.

Importantly, the *Elk Hills* court was not presented with, nor did it discuss, an income-producing intangible asset that derives its value from taxable property. Rather, it considered only goodwill, customer base, and favorable franchise terms and operating agreements (*Elk Hills*, *supra*, 57 Cal.4th at p. 618), each of which derive value from enterprise, or business activity. The income from these types of intangible assets is not earned " ' "from the [taxable] property itself or from the beneficial use thereof." ' " (*Id.* at p. 619.) Since *Elk Hills* did not address income from intangible assets that is attributable to the taxable property itself, it does not prohibit counting such income in valuing the taxable property. (See *Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350, 374 ["cases are not authority for propositions not considered"].) The teaching from *Elk Hills* that applies to such assets is that an income valuation of taxable property should

5

account for all income properly attributable to such taxable property.

Here, the subsidy represents income from the use of the taxable property itself. The fundamental objective of commercial real estate development is to generate income streams with a present value greater than the cost to the developer of its improvements and other costs. Olympic explains that developing the hotel without public support was uneconomical "because the [h]otel cost more than it can generate in capitalized income over its lifetime." The subsidy solved this problem by substituting payment of the transient occupancy tax for a portion of the income the hotel would otherwise need to generate from room rentals.

The record is clear that the subsidy is part of the overall return on investment the hotel's original developer, Olympic's predecessor in interest, required to agree to use its property the way the City wanted. If the original developer did not agree to use the property as a hotel, with 750 rooms set aside for conventioneers, no subsidy would have been paid. Because it did agree to use the property this way, it earned the subsidy plus the returns from the hotel's operation. For Olympic to acknowledge the subsidy effectively "substitute[d]" for unobtainable room rental income is to acknowledge the hotel income and the subsidy were fungible sources of return to justify development of the property as a hotel. Both the hotel room rentals and the subsidy provide a return from the property in the same way: they both flow directly from the use of the property as a hotel. Put another way, they are both " ' "earnings from the [taxable] property itself or from the beneficial use thereof." ' " (*Elk Hills*, *supra*, 57 Cal.4th at p. 619.) *Elk Hills* commands that such earnings be

6

considered in valuing taxable property under the income method. (*Ibid*.)

Olympic concedes that fees charged guests for use of hotel rooms (not just room rental amounts but also no-show charges, early departure and late check out fees, pet fees, and charges for rollaway beds and cribs) add to the value of its taxable property under an income method valuation. I am unpersuaded by Olympic's reasons offered to treat the subsidy any differently.

I reject Olympic's contention that, because the subsidy is not paid in exchange for the City acquiring a property interest in the hotel, it cannot be attributed to the property. Many properties generate income from transactions that do not grant a property interest in that property. An obvious example is the room rental fees that Olympic agrees are properly counted in the taxable property's income calculation. By Olympic's own authority, " '[g]uests in a hotel . . . have only a personal contract and no interest in the realty.' " (*Schell v. Schell* (1946) 74 Cal.App.2d 785, 789.)

I disagree with Olympic that, because the hotel's managers do not treat the subsidy as income on their books and records, that means it is not income from the property. Olympic agreed with the managers that the managers' compensation would vary according to hotel operating revenue, without regard to the subsidy. The managers therefore understandably included only operating revenue in reporting income; there was no reason to report the subsidy. The terms of Olympic's agreement with the managers do not delineate the universe of income generated from Olympic's use of the property.

Last, Olympic relies on Revenue and Taxation Code sections 402.9 and 402.95 as evincing a state policy against

7

assessors "including government subsidies in property tax assessments." However, Olympic acknowledges, as it must, that these provisions "concern low-income housing." The government's interest in low-income housing is not analogous to the City's interest in developing a hotel to increase use of its convention center. Low-income housing subsidies further broad social policy but provide no quantifiable economic benefit to a government agency or the general welfare. The existence of the tax code provisions Olympic cites indicates they were necessary to create a low-income housing subsidy exception to the general rule that subsidies may be considered as part of income for assessment purposes—not that there is a broad rule against including subsidies in income. In jurisdictions where no such exception has been made, government subsidies have been included in property income for valuation purposes. (See, e.g., *Rebelwood, Ltd. v. Hinds County* (Miss. 1989) 544 So.2d 1356, 1365 ["the value of any federal subsidy or benefits enjoyed by Taxpayer by reason of its ownership of [low-income housing project] must be considered in establishing [project's value for assessment purposes]"]; *ibid.* [citing cases in accord].)

**The Discount.**

Unbidden by the parties, the majority characterize the $36 million the hotel's managers paid Olympic as key money at the inception of their business relationship as a "discount" akin to the price reduction a consumer might get when buying a new car. (Maj. opn. *ante*, at pp. 14-15.) Because a discount is not income, the majority reason, the Board should not have counted it as income of the property for purposes of assessment. The majority's flawed characterization drives their flawed result.

8

As Olympic explains, the managers paid Olympic $36 million "[i]n consideration of [Olympic] entering into th[e hotel management] Agreement." The hotel management agreement gives the managers the right, and obligation, to use their trade name and intellectual property at the hotel and to conduct specified business operations there for a term of 50 years, for which they are to be compensated by Olympic. If Olympic defaults or terminates the agreement early for reasons unrelated to the managers' performance, it must repay the $36 million on a prorated basis. If Olympic terminates the agreement early for the managers' failure to satisfy agreed performance benchmarks, it must repay half of the $36 million on a prorated basis. And if the managers default, Olympic is entitled to terminate and retain the full $36 million.

This projected 50-year business relationship bears no resemblance to a consumer car purchase incentivized through a price discount—a transaction fully consummated at the time of delivery after which the parties go their separate ways. A far better analogy is the one the County suggests—a lease of commercial property for the purpose of carrying on a business.

In a typical commercial real estate lease, a property owner generates income from its property by granting property rights to a business in exchange for payments. The business then uses the property rights, in combination with its efforts, to conduct commercial activities that generate income of their own. An equivalent arrangement was established here under the management agreement.

Olympic owns the hotel as an income-generating investment. The managers are in the business of managing hotels. To carry out this business, they must have certain rights

9

in hotel properties they manage. The managers paid $36 million to Olympic in exchange for the right to enter and control the hotel and assume it as their place of business to the exclusion of other hoteliers. As set forth in the management agreement, subject to its other terms, the agreement placed "operation of the [h]otel[] under the exclusive supervision and control of [the managers]" and gave them "discretion and control in all matters relating to management and operation of the [h]otel[], free from interference, interruption or disturbance." Inherent in this delegation of rights is the right of the managers to occupy and possess the hotel to the extent necessary to operate it. (Cf. Civ. Code, § 3522 ["One who grants a thing is presumed to grant also whatever is essential to its use"].) Without such right, the managers would have no ability to rent rooms to guests whose relationship is exclusively with the managers.

The agreement details rights of control over the hotel above and beyond the right to operate the hotel. These include the right to make certain capital improvements; the right to make repairs; and the right to contract with third parties to advertise on the hotel's exterior. And confirming the possessory nature of the managers' rights in the hotel, the managers are obligated at the conclusion of their management term to "peacefully vacate and surrender the [h]otel to [Olympic]."

That the $36 million was paid for the managers' use of the hotel for 50 years to conduct their business is confirmed by its treatment upon termination. If Olympic deprives the managers of the right to the full term despite due performance by the managers, Olympic must refund a prorated portion of the $36 million. The right to use property over time for an agreed sum is another attribute shared between the management

agreement and a commercial lease. In my view the Board properly treated the $36 million as hotel income, akin to prepaid rent under a lease, for purposes of valuing the hotel.

Olympic argues that the $36 million cannot be treated in the same way as income from a lease because the management agreement is not *actually* a lease. Rather, Olympic says, it is an intangible asset. Olympic's focus on characterizing the management agreement instead of its economic substance misses the point. Again, the asset being valued is the hotel, not the management agreement. The mode of valuation is the income method. The relevant question is therefore whether the $36 million paid under the management agreement represents income of the real property or on account of its beneficial use.

Once again, I do not read *Elk Hills* as excluding from the income valuation of a taxable asset all income streams represented by intangible contract rights without regard to the true source of the income. *Elk Hills* requires an income valuation to be based on " ' "the earnings from the [taxable] property itself or from the beneficial use thereof . . . ." ' " (*Elk Hills*, *supra*, 57 Cal.4th at p. 619.) The usual means of generating income from real property is through the exchange of traditional property interests, like lease interests. While it is true that income generated by intangible assets like goodwill is not properly counted in real property income, that does not mean every contract right to receive real property income must be excluded from the taxable value of the real property. Again, there is no dispute that revenue from renting guest rooms is properly included in calculating a hotel property's taxable value, and Olympic concedes the guests acquire no property interest in hotels during their stays. Like the room rents deriving from intangible occupancy agreements, the $36 million, though paid pursuant to a

11

contract that is not a conventional lease, is income directly generated by Olympic's exploitation of its property rights in the hotel. It was money Olympic received on account of conveying rights founded entirely in Olympic's ownership interest in the property.

Finally, in supplemental briefing, Olympic asked that the majority's opinion reflect that "a payment made to secure an intangible asset (like the Management Agreement) is also intangible and therefore exempt from property taxes." The majority declined this request and rightfully so. Where the payment secures rights derived directly from taxable property, it should be considered income of the property for purposes of the income method valuation. In any event, the majority's analysis that the $36 million "discount" does not amount to income at all cannot be construed as implying Olympic's proposed rule.


GRIMES, Acting P. J.

12