[No. A058480. First Dist., Div. Two. June 13, 1994.]

GTE SPRINT COMMUNICATIONS CORPORATION, Plaintiff and Appellant, v.
COUNTY OF ALAMEDA et al., Defendants and Respondents.

**COUNSEL**

Richard N. Wiley for Plantiff and Appellant.

Daniel E. Lungren, Attorney General, Timothy G. Laddish, Assistant Attorney General, Richard F. Finn and Marguerite C. Stricklin, Deputy Attorneys General, Eric Eisenlauer and Robert Lambert for Defendants and Respondents.

**OPINION**

**PHELAN, J.**—Plaintiff, GTE Sprint Communications Corporation (Sprint), appeals from a judgment denying its complaint for property tax refunds

(Rev. & Tax. Code, § 5148)[1] for the years 1983 and 1984. In its complaint, as it did in its petitions for reassessment to the State Board of Equalization (the Board) below, Sprint contends that the Board's appraisers unlawfully included the value of its nontaxable intangible assets in the unit appraisal of its California property.[2] The Board responds that it was not directly taxing these intangible assets, but instead it was taxing the value of the tangible property as enhanced by the intangible values, in keeping with the well-established practice of ad valorem property taxation in this state. (See *Roehm v. County of Orange* (1948) 32 Cal.2d 280, 285 [196 P.2d 550]; *ITT World Communications, Inc.* v. *City and County of San Francisco* (1985) 37 Cal.3d 859, 863 [210 Cal.Rptr. 226, 693 P.2d 811] [hereafter *ITT #2*].)

We hold that the Board's valuation methodology, used to assess the full market value of Sprint's tangible property, is invalid because it did not satisfactorily account for the value of Sprint's intangible assets in appraising the value of the taxable tangible property. In so holding, we reject, as unsupported by the evidence, the Board's argument that the unit valuation of Sprint's tangible property, as a going concern, necessarily captured *only* the enhancement value of the intangible assets as permitted by law.

I

FACTUAL AND PROCEDURAL SUMMARY

On June 15, 1983, GTE Corporation, the parent company of Sprint, purchased all the capital stock of Sprint, which was then known as Southern Pacific Communications Company, for approximately $1.030 billion. Pursuant to its constitutional and statutory duty, the Board assessed the unit value of Sprint's California property at its fair market value. (See Cal. Const., art. XIII, § 19; §§ 401, 721-723; see *ITT #2, supra,* 37 Cal.3d at p. 862.)

A.

For the tax year 1983, the Board assessed Sprint's California property in the amount of $160 million. For the 1984 tax year, the assessed value of the California property was $350 million. In each instance, the Board's appraisers used a combination of several accepted appraisal methods to arrive at the unit value: the capitalized earnings ability (CEA) approach also known as the income approach; the reproduction cost new less depreciation (RCNLD)

---

[1]Unless otherwise indicated, all further statutory references are to the Revenue and Taxation Code.

[2]The 23 defendant counties agreed to be bound by the final judgment and stipulated that they would not actively participate in this action.

approach; and the market sales approach which was based on the October 1982 stock purchase agreement for the sale of Sprint.[3]

### 1.

The CEA approach estimates the future income stream a prospective purchaser could expect to receive from the enterprise and then discounts that amount to a present value by use of a capitalization rate. (See Cal. Code Regs., tit. 18, §§ 3, subd. (e), 8, subd. (a); *ITT #2, supra,* 37 Cal.3d at p. 864, fn. 3; see Bertane, *The Assessment of Public Utility Property in California* (1973) 20 UCLA L.Rev. 419, 429 (hereafter Bertane, *Public Utility Property*) ["The capitalization of earnings involves the translation of anticipated future income into present value. Capitalizing income is an attempt to determine the amount a prospective purchaser could pay for the property and recover his original cost by the time the property is worn out, with interest on his investment until the original cost is fully recovered."].)

Under this method, the Board's appraisers calculated the net operating income for the entire enterprise using two CEA value indicators: the regular CEA approach resulted in a unit value of $775,902,711; the modified CEA

---

[3]The Board's own regulations provide that one or more of the following methods of valuation may be used in appraising property:

(1) the comparative sales approach, which employs the compilation of prices of comparable properties. (Cal. Code Regs., tit. 18, § 3, subd. (a).)

(2) the stock and debt approach considers the "prices at which fractional interests in the property or comparable properties have recently sold, and the extent to which such prices would have been increased had there been no prior claims on the assets . . . ." (Cal. Code Regs., tit. 18, § 3, subd. (b).)

(3) The reproduction cost approach measures the "cost of replacing reproducible property with new property of similar utility, or of reproducing the property at its present site and at present price levels, less the extent to which the value has been reduced by depreciation, including both physical deterioration and obsolescence . . . ." (Cal. Code Regs., tit. 18, § 3, subd. (c).)

(4) The historical cost method is used only if "income from the property is regulated by law and the regulatory agency uses historical cost or historical cost less depreciation as a rate base . . . ." (Cal. Code Regs., tit. 18, § 3, subd. (d).) This method is inappropriate in this case since Sprint's rates are competitive and unregulated.

(5) The capitalized earnings approach (or income approach) involves a determination of the "amount that investors would be willing to pay for the right to receive the income that the property would be expected to yield, with the risks attendant upon its receipt . . . ." (Cal. Code Regs., tit. 18, § 3, subd. (e).)

This approach "is used in conjunction with other approaches when the property under appraisal is typically purchased in anticipation of a money income and either has an established income stream or can be attributed a real or hypothetical income stream by comparison with other properties. . . . It is the preferred approach for the appraisal of improved real properties and personal properties when reliable sales data are not available and the cost approaches are unreliable . . . ." (Cal. Code Regs., tit. 18, § 8, subd. (a).)

approach yielded a unit value of $950,104,169. They then calculated a factor which represented the ratio of Sprint's property in California compared to the entire system. In 1983, the Board allocated 17.9 percent of the CEA value to the California property. In 1984, the Board used a factor of 20.9727 percent.

2.

The RCNLD method measures the cost of replacing the property, less accrued depreciation. (Cal. Code Regs., tit. 18, § 3, subd. (c).) The Board used this method to calculate only the California property; it did not calculate the system-wide value under this method.

3.

Since the 1982 stock purchase agreement was relatively close to the March 1, 1983, lien date, the Board's appraisers also analyzed the sales agreement which indicated a system-wide value of approximately $894 million. This compares to Sprint's gross valuation of $1.03 billion or $982,339,000 net of current assets. Applying the staff's allocation factor of 17.9 percent to its system-wide value, the California portion is $160,000,230.

Using the methods described above, the Board arrived at the following California values for 1983:

| | |
|---|---|
| HCLD[4] | $68,920,772 |
| RCNLD | $100,196,385 |
| CEA | |
| (regular) | $152,711,349 |
| (modified) | $183,581,590 |
| stock sale | $160,000,000 |

After performing this analysis, the Board's appraisers drew the following conclusion: "All of the value indicators were considered. RCNLD and the modified CEA are the strongest indicators. Staff does not believe HCLD should be given much weight because of apparent loose regulation as evidenced by the earnings or income. The proposed sale price of SPCC [Sprint] to GTE was also taken into consideration in arriving at a

---

[4]HCLD refers to historical cost less depreciation.

value recommendation of $160 million for the California property of this company."

4.

In 1984, the Board's appraisers arrived at a system-wide unit value under the CEA approach ranging from approximately $1.3 billion to $1.56 billion. By comparison, Sprint's appraisers calculated a gross value for the company of approximately $1.535 billion or $1.454 billion (net of current assets).

Using the methods described earlier, the Board arrived at the following valuations for the California property:

| | |
|---|---|
| HCLD | |
| (regular) | $201,734,797 |
| (modified) | $301,989,829 |
| | |
| RCNLD | |
| (regular) | $238,734,470 |
| (modified) | $361,935,859 |
| | |
| CEA | |
| (regular) | $387,695,101 |
| (modified) | $441,913,184 |
| | |
| market cost | $350,000,000 |

Relying on the CEA and a modified RCNLD method, while giving more weight to the latter, the Board assessed Sprint's California property at $350 million.

B.

In 1983 and 1984, Sprint petitioned the Board for reassessment (§ 741), contending the values reached by the Board impermissibly included the value of the following nontaxable intangible assets: the Sprint trade name; customer base; assembled workforce; favorable broadband leases of transmission capacity from other carriers; favorable property leases; advertising agency relationships; favorable debt financing contracts; inventory of advertising materials; and the benefit of avoiding significant start-up costs by purchasing a going concern, which Sprint identified as goodwill and other intangible assets.

In its petitions, Sprint contended that the unit value for its taxable tangible property in California in 1983 should have been $90 million (compared to $160 million), and in 1984, the value should have been $202,044,000 (compared to $350 million).

## C.

At the reassessment hearings, Sprint contended that the Board's method of appraisal was fundamentally flawed because it made no allowance for the values of the nontaxable, intangible assets as California law requires. (*Roehm* v. *County of Orange, supra,* 32 Cal.2d at p. 289 [intangible assets are not subject to property taxation, except those enumerated in the Constitution which are not present here].) The Board does not dispute this fundamental principle. Phrased differently, Sprint argues that its fair market value contained both tangible and intangible assets and the Board attributed virtually the entire fair market unit value of its California property solely to its tangible (taxable) property, without making proper allowances for its nontaxable, intangible assets.

As we explain more fully below, the Board's appraisers are required by law to identify and value intangible assets, if any, and exclude these values from the appraisal of the taxpayer's property. The Board's own appraisers admitted that they did not attempt to identify any intangible assets, but instead ignored the detailed evidence produced by Sprint, which identified and separately valued numerous intangible assets. It is this indifference by the Board and its appraisers, in the face of opposing, credible testimony from Sprint of the existence of separate intangible assets, which we find to be error.

### 1. *The Board's Methodology*

At both reassessment hearings, the Board's appraisers asserted that they did not include the value of Sprint's intangible assets in their appraisals, but only valued the tangible property as a going concern, enhanced by the intangible values, as the law permits them to do.

### 2. *Sprint's Methodology*

Sprint's appraisers, all of whom were employed by American Appraisal Associates, Inc., testified that for both tax years, they first valued the entire enterprise: $1.030 billion in 1983 (under the sales method); and $1.535 billion in 1984 (under the CEA method). These amounts are relatively close to the Board's valuations (approximately $950 million and $1.5 billion,

respectively). Then they applied the RCNLD method to the categories of tangible properties, and either the RCNLD or the CEA value indicators to the intangibles assets. They correlated these values to the total value of the entire enterprise for each year, and formed a conclusion of the value of the tangible property of the entire enterprise. The appraisers then calculated the value of the tangible property in California at its replacement cost.

The Board denied Sprint's reassessment petitions ruling in 1983: "We believe that the staff, in applying the CEA approaches and in analyzing the sale of Sprint, have appraised petitioner's tangible assets at a value that reflects the fact that they are a part of a system of property that produces revenue and has value which exceeds the revenue-producing ability and value of the individual tangible components. This value is, of course, based on income that would not be possible if the property were not operated by the owner's workforce or if there were no customers requiring the service. *Thus, even were we to find (which we do not) that intangibles such as customer base and assembled workforce had value,* there is no basis here for saying that the values of such intangibles are not properly reflected in the value of the tangible property system." (Italics added.)

The Board gave similar reasons for denying the 1984 petition.

Based on the Board's apportionment of values to the 23 defendant counties, the counties levied taxes against Sprint. Sprint paid all the taxes due and filed requests for refunds, all of which were denied. This complaint followed. Sprint seeks damages for overpayment of property taxes of $772,620 for 1983 and $1,717,135 for 1984, plus interest.

### D.

Relying primarily on the records introduced at the reassessment hearings, the trial court denied Sprint's complaint for refunds, concluding: Sprint failed to establish that the valuation methods used by the Board were illegal; Sprint failed to prove that its intangible property was taxed; the cost approach used by Sprint to value the tangible property for the two tax years did not reflect the full market value of Sprint's unitary property as a going concern; and Sprint has not proved, by a preponderance of the evidence, the existence of the alleged nontaxable intangible assets, e.g., goodwill, broadband leases, customer base, assembled workforce, etc.

II

DISCUSSION

A.

We conclude below that the Board erred by actively ignoring Sprint's evidence of separate intangible assets, and by assuming, without adequate explanation, that its valuation methods automatically assess only the enhancement value of the intangible assets. Our conclusion does not depart from the rule announced in *Roehm* v. *County of Orange, supra,* 32 Cal.2d 280. That case and those which follow do not hold that any time the values of intangible assets are reflected in the appraisal of a going concern, it is only as enhancement value to the tangible property.

■ Where the taxpayer attacks the *validity* of the valuation method itself, the trial court must determine, as a question of law, whether the valuation method used is arbitrary, in excess of discretion or in violation of the law. When the taxpayer claims that the assessor and the Board erred in *applying* a valid assessment method, the decision of the Board is equivalent to the determination of a trial court, and a court may overturn the Board's decision only if it finds no substantial evidence in the record presented to the board. (*Bret Harte Inn, Inc.* v. *City and County of San Francisco* (1976) 16 Cal.3d 14, 23 [127 Cal.Rptr. 154, 544 P.2d 1354].)

Sometimes it is difficult to distinguish between the two types of challenges. Sprint's lawyer argued at trial: "Well, we contend that, by failing to allocate value among all the assets of the enterprise and segregating out the nontangible assets, that the method constitutes an invalid valuation method. [¶] We agree with the income approach for valuing the enterprise. We don't agree that, when you do that, you have valued only the tangible property."

■ Here, Sprint attacks the validity of the valuation methods used, alleging the Board improperly included the value of nontaxable, intangible property, and we treat this as an issue of law. (See *County of Orange* v. *Orange County Assessment Appeals Bd.* (1993) 13 Cal.App.4th 524, 529-530, fn. 6 [16 Cal.Rptr.2d 695]; *County of Stanislaus* v. *Assessment Appeals Bd.* (1989) 213 Cal.App.3d 1445, 1450 [262 Cal.Rptr. 439] ["By challenging the validity of the premise upon which the Board relied in reaching its decision, the County has presented this court with a question of law."].)

B.

■ The Board is charged with the ad valorem unit taxation of public utility property by article XIII, section 19 of the California Constitution.

(*ITT #2, supra*, 37 Cal.3d at p. 862; § 723 ["The board may use the principle of unit valuation in valuing properties of an assessee that are operated as a unit in a primary function of the assessee."].) In valuing the property, the Board must appraise it at its full value when put to its beneficial and productive use. (Cal. Const., art. XIII, § 1; § 401; *De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546, 566 [290 P.2d 544].)

The function of unit taxation is succinctly described in *ITT #2*: "One of the primary objectives of the system of unit taxation of public utility property is to ascertain and reach with the taxing power the entire real value of such property. [Citations.] It has long been recognized that 'public utility property cannot be regarded as merely land, buildings, and other assets. Rather, its value depends on the interrelation and operation of the entire utility as a unit. Many of the separate assets would be practically valueless without the rest of the system. Ten miles of telephone wire or one specially designed turbine would have a questionable value, other than as scrap, without the benefit of the rest of the system as a whole.' [Citation.] *Unit taxation prevents real but intangible value from escaping assessment and taxation by treating public utility property as a whole, undifferentiated into separate assets (land, buildings, vehicles, etc.) or even separate kinds of assets (realty or personalty)."* (*ITT #2, supra*, 37 Cal.3d at p. 863, italics added; Bertane, *Public Utility Property, supra*, at pp. 426-427.)

■ As the Board points out, although intangible property is exempted from direct property taxation, the courts in this state have repeatedly held that the value of such intangible property may be included in the valuation of otherwise taxable tangible property. (*ITT World Communications, Inc.* v. *County of Santa Clara* (1980) 101 Cal.App.3d 246, 254 [162 Cal.Rptr. 186] (hereafter *ITT #1*); *Los Angeles SMSA Ltd. Partnership* v. *State Bd. of Equalization* (1992) 11 Cal.App.4th 768, 776 [14 Cal.Rptr.2d 522].)

■ This concept was described over 45 years ago in *Roehm* v. *County of Orange, supra*, 32 Cal.2d at pages 285-286: "Intangible values, however, that cannot be separately taxed as property may be reflected in the valuation of taxable property. Thus, in determining the value of [taxable] property, assessing authorities may take into consideration earnings derived therefrom, which may depend upon the possession of intangible rights and privileges that are not themselves regarded as a separate class of taxable property. [Citations.]"

In *Western Title Guaranty Co.* v. *County of Stanislaus* (1974) 41 Cal.App.3d 733, 741 [116 Cal.Rptr. 351], the court stated: "[T]he propriety

of including nontaxable intangible values in the valuation of otherwise taxable property has been asserted by the courts in a variety of contexts, and market value for assessment purposes is the value of property when put to beneficial or productive use." (Accord, *County of Stanislaus* v. *Assessment Appeals Bd.*, *supra*, 213 Cal.App.3d at p. 1455.)

## C.

Acknowledging the rule upon which the Board relies, we nonetheless hold that the Board's inclusion of the *full* value of the intangible assets in computing the enhanced value of Sprint's tangible property, without adequately addressing Sprint's evidence of intangible assets, was error.

The evidence introduced by Sprint's appraisers reasonably established the existence of intangible assets as part of Sprint's unitary value. Sprint's appraisers, all qualified experts who relied upon established appraisal methods and authorities, identified and valued several categories of intangible assets, just as they had done for numerous other companies. These appraisers presented elaborate worksheets and supporting documents to verify the existence of and the value applied to the intangible assets.

Dismissing these valuations out of hand, the Board and its appraisers categorically denied that they taxed the intangible assets, except as they enhanced the value of the tangible property as a going concern, as permitted by the *Roehm* line of cases. This argument was explained by the Attorney General in his appellate brief: "In short, appellant's unitary value in California is based upon its appraisal unit, which is all of appellant's property operating together to produce income from its primary function—telecommunication services. (Section 723.) *Therefore, any value attributable to that unit is taxable going concern value of that property put to its highest and most beneficial use.* [Citations.]" (Italics added.)

This position echoed the testimony of the Board's appraisers. At the 1983 reassessment hearing, Board appraiser Robert Huck testified: "As you know, in property tax work, we consider virtually all intangibles to be associated with the ownership of the property and then those benefits that come from those intangibles depend upon the ownership of the property and therefore are included in the value of the property for property tax purposes."

At the 1984 hearing, Board appraiser William Jackson testified: "Under your hypothetical and under our methods, those intangibles are not in our value estimate. If they have a separate and distinct value of their own, they are above and beyond the estimate that we have measured. They are not a deduction from; they are an addition to."

The Board's appraisers also testified that they did not look for and made no attempt to value intangible assets. This attitude prevailed despite the fact, as Board appraiser Mel Kau testified, that if he could identify a separate market value to the intangible asset, he would have to exempt it.

In his testimony at the 1984 reassessment hearing, Board appraiser Wallace Moore testified that he ignored the $428 million value that Sprint assigned to intangible assets on its books in 1984. Mr. Moore explained: "Any intangibles included would probably be, number one, taken care of in the correlation of our indicators. [¶] And number two, the existence of intangibles was questionable, whether there really were intangibles."

At that same hearing, Board appraiser Jackson testified: "What you're saying, if you convinced me there were intangible values, would I deduct that from the staff's value? . . . [¶] No, I would not." As Jackson further explained: "I would not deduct them [intangible assets] from our value indicator because they are not in our value indicators. We have already removed the contribution of labor. We have removed the contribution of management. We have residual—the net income down. So we have capitalized an income attributable to tangible property. [¶] Now, I have to add one modification here. Under California law, the income attributable to tangible property can be enhanced by the existence of intangibles."

In contrast, Sprint's appraisal method was succinctly described by appraiser John Russel in his 1984 testimony: "I said that the appraisal process involved first valuing the entire enterprise; then identifying the various components making up that operating enterprise. One category being the tangible property; another large category being intangible assets. And that being comprised of several small items such as leasehold interests . . . . [¶] Then there is a process called correlation of values, wherein the appraiser looks at the total enterprise value and the value indications he has derived from various parts and, in consideration of all of the factors that come out of the investigation, he then draws the conclusion of value for each of the elements comprising the enterprise."

In our view the Board and its appraisers erred in assuming that unit valuation, especially when calculated by the CEA method, necessarily taxes only the intangible values as they enhance the tangible property. This absolutist approach obscures the Board's duty to exclude intangible assets from assessment.

The Board's own manual, The Appraisal of Public Utilities (1981) states: "In practice, usually there is no way to distinguish and value separately

benefits attributable to intangibles and benefits attributable to tangible properties. Furthermore, tangible properties without recognized intangible use rights are valueless since value arises from putting property to beneficial and/or productive use. For property tax purposes then, the concept of property is one which encompasses all expectancies and opportunities to derive income which occur because of the ownership of tangible properties. *This concept must be qualified whenever it is possible to distinguish and value separately the income expectancies of intangibles.*" (*Id.* at p. 4, italics added.)

"The Board's definition of the unit usually includes items that are nontaxable. . . . Under the unit concept, the procedure is to estimate unitary value, then make the allocation between states (if any) *and then deduct from the allocated unit value the value of nontaxable items located within California.*" (The Appraisal of Public Utilities, *supra*, at pp. 8-9, italics added.)

While paying lip service to the concept of exempting intangible assets from taxation, the Board and its appraisers take a very myopic view of the rule when presented with substantial evidence showing the presence of such intangible assets. Recent cases have held that the very same intangibles identified and valued by Sprint must be excluded from assessment.

In *Shubat* v. *Sutter County Assessment Appeals Bd.* (1993) 13 Cal.App.4th 794 [17 Cal.Rptr.2d 1], at issue was the assessed valuation of property owned or used by Nor Cal Cablevision, Inc. (Nor Cal), a cable television company. The county assessor appealed a decision by the Board which found that a portion of Nor Cal's assessed value was allocable to nontaxable intangible assets: the right to do business, going concern value, the subscriber list, favorable franchise terms and the possessory interest in the public rights-of-way. (*Id.* at pp. 798-799.) After subtracting the value of the tangible assets and the nontaxable subscriber list from the total value, the Board allocated the residual value equally among three intangibles: the taxable property interest, and the nontaxable going concern value and the right to do business. (*Id.* at p. 799.) The Board determined that the favorable franchise terms are inseparable from the right to do business. (*Ibid.*) The county argued that all the residual value should have been allocated to the taxable possessory interest. (*Id.* at p. 799-800.)

In rejecting the county's argument, the court held that the going concern value, favorable franchise rights, customer list, and the right to do business all were intangible assets that had value apart from the possessory interest and were exempt from property taxation. (*Shubat* v. *Sutter County Assessment Appeals Bd.*, *supra*, 13 Cal.App.4th at pp. 802-804.) The court reasoned: "While we agree intangible values *may be reflected* in the value of a

possessory interest, it does not follow such values are subsumed as a matter of law." (*Id.* at p. 804, italics in original.)

In *County of Orange* v. *Orange County Assessment Appeals Bd.*, *supra*, 13 Cal.App.4th 524, the county appealed the Board's decision to reject its unitary appraisal of taxpayer American Television and Communications Corporation, a cable television operator. The Board had ruled that the county's method improperly included the value of nontaxable intangible assets such as existing franchises or licenses to construct, a subscriber base, marketing and programming contracts, management and operating systems, an in-place work force, going concern value, and goodwill. (*Id.* at p. 533.) In so doing, the Board relied on section 107.7 (enacted in 1988) which addresses the valuation of cable television possessory interests and describes the preferred method of valuing that portion of the cable television company's taxable property shall be by capitalizing the annual rent (§ 107.7, subd. (b)(1)). (*County of Orange* v. *Orange County Assessment Appeals Bd.*, *supra*, at p. 531.)

In relevant part, section 107.7, subdivision (d) provides that the following intangible assets are not subject to ad valorem property taxation: "subscribers, marketing and programming contracts, nonreal property lease agreements, management and operating systems, a work force in place, going concern value, deferred, startup, or prematurity costs, . . . and goodwill. However, a cable television possessory interest may be assessed and valued by assuming the presence of intangible assets or rights necessary to put the cable television possessory interest to beneficial or productive use in an operating cable television system." The Legislature has declared that this statute clarified existing law. (Stats. 1988, ch. 1630, § 3, p. 5940.) The reviewing court affirmed the Board's conclusion, *ante*, that the county's method improperly captured nontaxable intangibles. (*County of Orange* v. *Orange County Assessment Appeals Bd.*, *supra*, 13 Cal.App.4th at pp. 533-534.)

In *County of Los Angeles* v. *County of Los Angeles Assessment Appeals Bd.* (1993) 13 Cal.App.4th 102 [16 Cal.Rptr.2d 479], the appellate court affirmed the trial court's denial of a writ of mandate by which the county challenged the Board's decision to reduce the assessment of rent-a-car agencies' taxable possessory interest of counter space and ready/return parking lots at three airports. The court disapproved the Board's contention that the agencies' possessory interests extended to the use of the airport generally, not simply the areas the companies occupied (the designated counters and ready/return lots). (*Id.* at pp. 110-112.) The Court of Appeal

held that only the property exclusively possessed and used, pursuant to the concession agreements, can be considered taxable possessory interests. "The further rights granted by the agreements, to do business at the airports and their environs, are not assessory interests. They are intangibles, not subject to property (possessory interest) tax. [Citation.]" (*Id.* at p. 112.)

For related reasons, the reviewing court also rejected, as did the Board and the trial court, the county's method of capitalizing the rent-a-car agencies' concession fees, which are measured as a percentage of their income from their airport area operations. The county sought to justify this method by characterizing these payments as rent for their possessory interests in the airports as business premises. (*County of Los Angeles* v. *County of Los Angeles Assessment Appeals Bd.*, *supra*, 13 Cal.App.4th at pp. 106, 112-113.) The court held that this method improperly included income derived from the firms' intangible business opportunities—"i.e., business produced not by the airport counters but through advertising, goodwill, national reservation systems, and the like." (*Id.* at pp. 106-107, 112-113, fn. omitted.)

These cases demonstrate that where the types of intangible assets identified by Sprint may reasonably be said to exist, the Board must exclude their values when assessing the tangible property for taxation. None of these cases expressly or impliedly abrogate the rule that intangible values may be treated as enhancing the value of the tangible property.

In a different but related context, two recent federal decisions confirm Sprint's position that customer base and assembled workforce can be properly identified as intangible assets having a separate, calculable value.

In *Newark Morning Ledger* v. *U.S.* (1993) __ U.S. __ [123 L.Ed.2d 288, 113 S.Ct. 1670], the Supreme Court held that the usual rule holding that "goodwill" (defined as "the expectancy of continued patronage") (*id.* at p. __ [123 L.Ed.2d at p. 299]), is not depreciable, does not apply where the taxpayer is able to prove that this intangible has a separate value and a limited useful life. (*Id.* at p. __ [123 L.Ed.2d at p. 306].) In this case, the taxpayer contended that its intangible asset of paid subscribers (i.e., a customer base), had an estimated future profit value at the time it purchased the newspaper, and that the years these readers could be expected to continue their subscriptions could be estimated with reasonable accuracy according to generally accepted statistical principles. (*Id.* at p. __ [123 L.Ed.2d at p. 307].)

In *Ithaca Industries, Inc.* v. *C.I.R.* (4th Cir. 1994) 17 F.3d 684, the appellate court held that an in-place workforce was an intangible asset.

However, relying on *Newark Morning Ledger* v. *U.S.*, *supra*, the court held that the taxpayer's "workforce was not an amortizable asset because its characteristics suggest no sufficiently accurate means of estimating its useful life." (*Ithaca Industries, Inc.* v. *C.I.R.*, *supra*, 17 F.3d at p. 690.)

Most, if not all, of the intangible assets identified by Sprint as having independent value already have been recognized as such in the decisions mentioned above and in section 107.7. To permit the Board and its appraisers to ignore such widely accepted categories of intangibles with no explanation, other than it was appraising the "enhancement value" of the intangibles, would grant the Board unfettered discretion in its assessment practices, thereby precluding any meaningful judicial review.

## III

### CONCLUSION

While we recognize that intangible assets may contribute enhancement value to the tangible property of the going concern, we cannot conclude, as the Board does, that the entire value of the intangible assets identified by Sprint may be subsumed, as a matter of law, in the unit value of Sprint's California property.

Accordingly, it is necessary to return this matter to the Board for a reassessment hearing as to both tax years, at which time the Board's appraisers shall have an opportunity to present evidence rebutting Sprint's identification and/or valuation of intangible assets. At that hearing, both parties may present evidence as to the portion of the intangible values, if any, that can be deemed to enhance the value of the tangible property.

The judgment is reversed and the superior court is directed to remand this matter to the Board for a rehearing to be conducted consistent with the views expressed herein.

Kline, P. J., and Smith, J., concurred.

A petition for a rehearing was denied July 12, 1994, and respondents' petition for review by the Supreme Court was denied September 26, 1994. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.