Filed 9/13/23 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| SHR ST. FRANCIS, LLC, et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO, <br><br>     Defendant and Respondent. | A163847 <br><br> (City & County of San Francisco County Super. Ct. No. CGC-20-582772) <br><br> **ORDER MODIFYING OPINION; AND ORDER DENYING REHEARING [NO CHANGE IN JUDGMENT]** |

**BY THE COURT:**

The opinion filed August 17, 2023, is modified as follows:

The second and third sentences and the citation that follows the third sentence of the second full paragraph on page 15 are replaced with the following sentence and citation:

> Although the Board claimed that it increased the capitalization rate, in part, "to further account for the value of the intangibles," there is nothing in the record indicating that the quarter-point increase captured the full value of the management agreement or that the capitalization rate may be used to remove the value of a *particular* nontaxable, intangible asset from the assessed value of a property. (See Cal. Code Regs., tit. 18, § 313, subd. (e) ["The Board may act only upon the basis of proper evidence admitted into the record"].)

1

This order does not effect a change in the judgment.

Defendant and respondent City and County of San Francisco's (City) Request for Judicial Notice in Support of Petition for Rehearing is granted.

The City's September 1, 2023 petition for rehearing is denied.

Date: _____                    _____, P.J.

2

A163847 / SHR St. Francis LLC v. City and County of San Francisco

Trial Court:Superior Court of San Francisco

Trial Judge:      Richard B. Ulmer Jr.

Counsel:     Greenberg Traurig; Colin W. Fraser, Cris K. O'Neall, and Ruben Sislyan, for Plaintiffs and Appellants.

David Chiu, City Attorney; Yvonne R. Mere, Chief Deputy City Attorney; Scott M. Reiber, Chief Tax Attorney; Frederick P. Sheinfield, Peter J. Keith, and Moneer H. Jamil, Deputy City Attorneys for Defendant and Respondent.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| SHR ST. FRANCIS, LLC, et al., | |
| Plaintiffs and Appellants, | A163847 |
| v. | |
| CITY AND COUNTY OF SAN FRANCISCO, | (City & County of San Francisco Super. Ct. No. CGC-20-582772) |
| Defendant and Respondent. | |

In 2015, there was a change in ownership of the Westin St. Francis, a luxury hotel located in defendant and respondent City and County of San Francisco (San Francisco or City), triggering a reassessment for property tax purposes. To assess the taxable value of the hotel, the San Francisco Assessor (Assessor) used the income approach—which " 'rests upon the assumption that in an open market a willing buyer of the property would pay a willing seller an amount approximately equal to the present value of the future income to be derived from the property.' " (*Olen Commercial Realty Corp. v. County of Orange* (2005) 126 Cal.App.4th 1441, 1446.) The approach required the Assessor to "estimate[] the future income stream a prospective purchaser could expect to receive from the enterprise [operated on the property] and then discount[] that amount to a present value by use of a capitalization rate." (*GTE Sprint Communications Corp. v. County of Alameda* (1994) 26 Cal.App.4th 992, 996 (*GTE Sprint*).)

1

Plaintiffs and appellants SHR St. Francis, LLC, and Strategic Hotels and Resorts, LLC (Strategic) (collectively, the Strategic Plaintiffs), the owners of the hotel, challenged the new assessment in an appeal to the San Francisco Assessment Appeals Board (Board). After adjusting the capitalization rate, the Board largely upheld the new assessment.

The Strategic Plaintiffs now contend the assessed value of the hotel is too high because it improperly subsumes the value of four nontaxable, intangible assets: (1) the hotel's management agreement; (2) income from guests who cancel their reservations (cancellations), do not show up for their reservations (no shows), or leave the hotel before their reservation is over (attrition) (collectively, cancellation/no show/attrition income); (3) in-room movies; and (4) guest laundry services. The City counters that the assessed value is correct because its deduction of the fees or expenses associated with the asset from the hotel's future income stream fully removed that asset's value from the assessed value, because the asset is taxable as an intangible attribute of the property, or because the asset did not generate any excludable income. We find that the method used by the City to exclude the value of nontaxable, intangible assets from the assessed value of the hotel—i.e., the deduction of fees or expenses associated with the asset from the hotel's future income stream—is legally incorrect. As a result, the assessed value of the hotel improperly subsumed the value of the management agreement, in-room movies, and guest laundry services. We, however, find that the assessed value properly included the cancellation/no show/attrition income because that asset is a taxable attribute of the property. We therefore affirm in part and reverse in part and remand for a redetermination of the taxable value of the hotel.

## BACKGROUND

The Westin St. Francis is the third largest hotel in San Francisco. It has 1,195 rooms and is located in Union Square. The hotel consists of two buildings on two lots. The first building is 14 stories and was built in 1904; the second building is 31 stories and was built in 1972.

The Westin Hotel Company (Company) operates the hotel pursuant to a management agreement. Under that agreement, the Company, among other things, manages and maintains the hotel, handles all personnel and employment matters, provides advertising and promotional services, and provides and manages all computer services, including reservations. In return for those services, the Company receives a base management fee and an incentive management fee (collectively, the management fees).

In addition to renting its rooms, the Westin St. Francis generates income from several other sources. As relevant here, the hotel receives income from guest cancellations, no shows, and attrition. The hotel also profits from in-room movies and guest laundry services provided by third party vendors to its guests.

In December 2015, BRE Diamond Hotel LLC, a subsidiary of Blackstone, purchased Strategic, the owner of the Westin St. Francis and other luxury hotels. The transaction resulted in a change in ownership, triggering a reassessment by the Assessor, who assessed the hotel's value at approximately $795 million.

The Strategic Plaintiffs appealed this assessment to the Board, contending the Assessor improperly subsumed the value of four nontaxable, intangible assets into the taxable value of the hotel: (1) the management agreement; (2) cancellation/no show/attrition income; (3) in-room movies; and (4) guest laundry services. According to the Strategic Plaintiffs, the Assessor

3

should have deducted the net income generated by each of those assets from the future income stream used to value the hotel.[1]

The Board disagreed, finding that "[t]he deductions on the operating statement already accounted for all intangibles." First, the Board found that deduction of the management fees fully removed the "value" of the "management services." Second, the Board found that the cancellation/no show/attrition income was taxable because it "is similar to income derived from guests who completed their stays at the hotel." And to the extent that income was not taxable, it was accounted for through "existing deductions." Third, the Board found that in-room movies are a taxable asset because the income from those movies is "just an incidental component of the income from the rooms themselves." Finally, the Board found that guest laundry services are a taxable asset because they are "a normal part of operating a hotel of the caliber of the Westin" St. Francis and because the income from those services is "no different from the income from room reservations." The Board did, however, increase the capitalization rate from five percent to 5.25 percent to account for "comparable sales" and "to further account for the value of the intangibles." This reduced the taxable value of the hotel to approximately $785 million.

The Strategic Plaintiffs then filed a verified complaint for refund, alleging that the City failed to remove from the assessed value of the hotel the full value of the same four intangible assets they had identified in their appeal to the Board. The complaint sought a refund of "property taxes paid"

---

[1] The Strategic Plaintiffs argued that the net profit generated from the management agreement equaled 20 percent of the management fees. It also calculated the cancellation/no show/attrition income as $545,000, and the net profits generated from in-room movies and guest laundry services as $196,065 and $533,600, respectively.

4

and a remand to the Board "to determine the assessed value of only the tangible taxable property."

The trial court upheld the Board's determination. In rejecting any further deductions for the value of the management agreement beyond the management fees, the court found that the Strategic Plaintiffs did not produce credible evidence that the assessment improperly subsumed any portion of the fair market value of that agreement. As to the cancellation/no show/attrition income, the court found that this income, like the "income from guests who complete[] their stays," is "derived from the real property" and therefore taxable. Finally, the court agreed with the Board that income from in-room movies and guest laundry services is no different than income from room reservations and is therefore taxable.

The Strategic Plaintiffs timely appealed.

## DISCUSSION

### A. Standard of Review

"The proper scope of review of assessment decisions is well established. [Citation.] 'When the assessor utilizes an approved valuation method, his factual findings and determinations of value based upon the appropriate assessment method are presumed to be correct and will be sustained if supported by substantial evidence.' [Citation.] However, where the taxpayer attacks the validity of the valuation method itself, the issue becomes a question of law subject to de novo review." (*Elk Hills Power, LLC v. Bd. of Equalization* (2013) 57 Cal.4th 593, 606 (*Elk Hills*).)

Although this is "well-settled law . . . "it can be 'difficult to distinguish between' " a challenge to the valuation " ' "method" ' " and a challenge to the " ' "application" ' " of a valuation method. (*SHC Half Moon Bay, LLC v. County of San Mateo* (2014) 226 Cal.App.4th 471, 486 (*SHC Half Moon Bay*).)

The test for distinguishing between these two challenges hinges on whether the challenge " 'present[s] a question about the facts specific to [the] plaintiffs' case or the data to insert when calculating the value of the property' " or " 'a question about the methodology prescribed . . . for calculation of the property value.' " (*Id.* at pp. 488–499, quoting *Sky River LLC v. County of Kern* (2013) 214 Cal.App.4th 720, 731 (*Sky River*).) If the issue is " 'whether the assessor misunderstood or distorted the available data,' " it is a challenge to the application and subject to substantial evidence review. (*SHC Half Moon* Bay, at p. 489, quoting *Union Pacific Railroad Co. v. State Bd. of Equalization* (1991) 231 Cal.App.3d 983, 992.) But if the issue is " 'whether [the assessor] chose an appraisal method which by its nature was incapable of correctly estimating market value,' " it is a challenge to the method and subject to de novo review. (*Ibid.*)

Here, the Strategic Plaintiffs contend the City did not exclude the *full* market value of four nontaxable, intangible assets from the assessed value of the hotel when it simply deducted the fees or expenses associated with those assets and refused to deduct any of the net income generated by those assets from the hotel's future income stream. In making this contention, the Strategic Plaintiffs are necessarily arguing that the method used by the City to assess the hotel is, " 'by its nature, incapable of correctly estimating market value.' " (*SHC Half Moon Bay*, *supra*, 226 Cal.App.4th at p. 489.) This appeal therefore presents a challenge to the valuation method used by the City and is subject to de novo review.

### B. General Principles of Property Taxation

"Article XIII, section 1 of the California Constitution requires generally the assessment of property at 'fair market value.' " (*Elk Hills*, *supra*, 57 Cal.4th at p. 606.) But not all property is taxable. For example, after the

amendment of former section 14 of article XIII of the California Constitution (now art. XIII, § 2) in 1933, intangible assets that are not enumerated in that section are "exempt from property taxation."[2] (*Elk Hills*, at p. 607.)

Revenue & Taxation Code sections 110 and 212 implement these sections of the California Constitution.[3] (*Elk Hills*, *supra*, 57 Cal.4th at p. 607.) Section 110, subdivision (a) defines the " '[f]air market value' " of a property as "the amount of cash or its equivalent that property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other, and both the buyer and the seller have knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used, and of the enforceable restrictions upon those uses and purposes." Section 110, subdivision (d)(1), however, exempts certain intangible assets or rights from taxation: "The value of intangible assets and rights relating to the going concern value of a business using taxable property shall not enhance or be reflected in the value of the taxable property." Section (d)(2) then explains how the taxable value of properties that include nontaxable, intangible assets or rights should be calculated: "If the principle of unit valuation is used to value properties that are operated as a unit and the unit includes intangible assets and rights, then the fair market value of the taxable property contained within the unit shall be determined by removing from the value of the unit the fair market value of the intangible assets and rights contained

---

[2] Under article XIII, section 2 of the California Constitution, only the following forms of intangible property are taxable: (1) notes, (2) debentures, (3) shares of capital stock, (4) bonds, (5) solvent credits, (6) deeds of trust, and (7) mortgages. (See *Roehm v. County of Orange* (1948) 32 Cal.2d 280, 284–285 (*Roehm*).)

[3] All further statutory references are to the Revenue & Taxation Code.

7

within the unit." Despite this directive to remove the value of nontaxable, intangible assets or rights, "[t]axable property may [nonetheless] be assessed and valued by assuming the presence of intangible assets or rights necessary to put the taxable property to beneficial or productive use." (§ 110, subd. (e).)

Section 212, subdivision (c) provides similar guidance: "Intangible assets and rights are exempt from taxation and, except as otherwise provided in the following sentence, the value of intangible assets and rights shall not enhance or be reflected in the value of taxable property. Taxable property may be assessed and valued by assuming the presence of intangible assets or rights necessary to put the taxable property to beneficial or productive use."

The California Supreme Court reconciled these provisions of sections 110 and 212 in *Elk Hills*. According to our high court, "there is no reason why an intangible asset cannot enhance both taxable property and the going concern value of the business on which the property resides." (*Elk Hills*, *supra*, 57 Cal.4th at p. 614.) Thus, in valuing taxable property, an assessor may "assume[] the *presence* of an intangible asset *necessary to put taxable property to beneficial use.*" (*Ibid.*, italics added; see also § 212, subd. (c).) This is because "the beneficial or productive use of tangible property 'depend[s] upon the possession of intangible rights and privileges that are not themselves regarded as a separate class of taxable property . . . .' " (*Elk Hills*, at p. 612, quoting *Roehm*, *supra*, 32 Cal.2d at p. 285.)

At the same time, "the value of intangible assets 'relating to the going concern value of a business' "—i.e., its enterprise value—is not taxable.[4] (*Elk Hills*, *supra*, 57 Cal.4th at p. 614.) Thus, "even when an intangible asset

---

[4] "The going concern value of a business means '[t]he value of a commercial enterprise's assets or of the enterprise itself as an active business with future earning power, as opposed to the liquidation value of the business or of its assets.' " (*Elk Hills*, *supra*, 57 Cal.4th at p. 608.)

enhances the value of taxable property . . ., to the extent that the unitary valuation reflects a direct valuation of the asset itself, or includes income appropriately attributed to enterprise value," that direct valuation or income must be removed from the assessed value of the property. (*Id.* at p. 615.) Put another way, to the extent "the value of the taxable property is enhanced" by "*the value* of intangible assets," it is not taxable. (*Elk Hills*, at p. 615, italics in original.)

Consistent with these principles, sections 110 and 212 establish that assessors may assume "the presence of intangible assets when valuing *taxable property*," but may not "tax *the value* of intangible assets directly." (*Elk Hills*, *supra*, 57 Cal.4th at p. 614, italics in original.) In doing so, assessors perform "their constitutional duty to assess taxable property at fair market value . . . while making sure that the value of intangible assets is not improperly subsumed within the value of taxable property." (*Ibid.*)

## C. The Management Agreement

Both parties agree that the City properly used the income approach to determine the taxable value of the Westin St. Francis. Under that approach, the appraiser estimates the future income stream of the hotel and converts that income into a present value using a capitalization rate. (*GTE Sprint*, *supra*, 26 Cal.App.4th at p. 996.) California Code of Regulations, title 18, section 8 (rule 8) provides that the future income stream may be estimated using the "income from operating [the] property" (net operating income) so long as "sufficient income . . . to provide a return on working capital and other nontaxable operating assets" is "excluded."[5] (Rule 8, subd. (e).) Thus, if "income from operating a property is used" to assess it, "adjustments must be

_____

[5] This rule is binding on assessors. (*Ocean Avenue LLC v. County of Los Angeles* (2014) 227 Cal.App.4th 344, 350.)

9

made to exclude income that is not attributable to the taxable property pursuant to Rule 8(e)." (Bd. of Equalization, Assessors' Handbook (Jan. 2015) Section 502, Advanced Appraisal, p. 56 (Advanced Appraisal).)

To determine the net operating income of the hotel, the City excluded income attributable to the management agreement by deducting the management fees.[6] The Strategic Plaintiffs, however, argue that the City, by *only* deducting the management fees, did not account for the return on that agreement. They therefore contend the method used by the City to assess the hotel "improperly subsumed in the valuation" "the fair market value of" the management agreement. (*Elk Hills*, *supra*, 57 Cal.4th at p. 615.) We agree and find that the Strategic Plaintiffs met their burden of showing that the City "utilized a legally erroneous methodology." (*DFS Group, L.P. v. County of San Mateo* (2019) 31 Cal.App.5th 1059, 1074 (*DFS Group*).)

Under rule 8, subdivision (e), the taxable value of a property must exclude "sufficient income . . . to provide a return on . . . [any] nontaxable operating assets." This is because "[i]nvestors demand both a *return* of their investment (a recapture of the investment) and a *return on* their investment (a yield on the investment)." (Bd. of Equalization, Assessors' Handbook (Jan. 2002) Section 501, Basic Appraisal, p. 99, italics in original).) Thus, "[i]f the income stream used by the appraiser is in part generated by intangible assets and rights, the appraiser must either: (1) attribute sufficient income to provide a return of and on the intangible assets and rights, or (2) remove the value of the intangible assets and rights from the income indicator (using any acceptable valuation method) after the income stream has been capitalized or

---

[6] The parties agree that the management agreement is an intangible asset that is not taxable.

10

discounted to present value." (Advanced Appraisal, *supra*, at p. 163, fn. omitted.)

Because income from a nontaxable, intangible asset like the management agreement should typically include both a return of and a return on that asset, simply deducting the fees or expenses associated with the asset from the hotel's net operating income does not remove its *full* value from the assessed value of the property unless there is evidence that the return on the asset is no greater than its fees or expenses. As explained in the Assessors' Handbook—which is "accorded great weight in interpreting valuation questions" (*Sky River*, *supra*, 214 Cal.App.4th at p. 735)—"[t]he value of intangible assets and rights cannot be removed by merely deducting the related expenses from the income stream to be capitalized. Allowing a deduction for the associated expense does not allow for a return on the capital expenditure." (Advanced Appraisal, *supra*, at p. 162, fn. omitted). Thus, "deduction of a management fee from the income stream of a hotel does not recognize or remove the value attributable to the business enterprise that operates the hotel." (*Ibid.*)

This only makes sense from a business standpoint. If the fees or expenses associated with a nontaxable, intangible asset like a contract "were so high as to account completely for all intangible benefits to" a property owner, then "the owner would have no reason to agree to" that contract. (*Olympic and Georgia Partners, LLC v. County of Los Angeles* (2023) 90 Cal.App.5th 100, 112 (*Olympic*), review granted July 12, 2023, S280000.) Such a premise is "illogical" and appears to have "no empirical support." (*Ibid.*) Thus, the City "utilized a legally erroneous methodology" when it attempted to exclude the value of the management agreement by deducting,

11

with no further justification, only the management fees from the hotel's net operating income.[7] (*DFS Group*, *supra*, 31 Cal.App.5th at p. 1074.)

Of course, the City could have presented evidence that the return generated by the management agreement or the quantified value of that agreement did not exceed the management fees themselves. If the City had done so, then deducting the management fees from the hotel's income stream may have been sufficient to account for the full value of the agreement. It, however, presented no such evidence. As a result, its otherwise formulaic deduction of those fees from the hotel's income stream was legally erroneous.

The City's arguments to the contrary are not persuasive.

First, notwithstanding the City's assertion, the Strategic Plaintiffs did produce " 'credible evidence' " that " 'quantified values of' " the management agreement " 'were impermissibly subsumed in the assessment value.' " They did so by establishing that the method used by the City to remove the value of the management agreement from the assessed value, by its nature, did not allow for a return on that agreement. (See Advanced Appraisal, *supra*, at p. 162.) Because the City's valuation method did not account for a critical component of the value of the management agreement—i.e., the return on that agreement—its assessment "violates section 110[, subdivision] (d)(1),

_____

[7] The Strategic Plaintiffs repeatedly refer to the method used by the City to value the management agreement as the "Rushmore Method." But this reference appears to be somewhat misleading. The Rushmore Method, "a species of the income method, is a model of hotel valuation developed by Stephen Rushmore." (*SHC Half Moon Bay*, *supra*, 226 Cal.App.4th at p. 478, fn. 5.) It "holds that the deduction of management fees and franchise fees accounts for *any and all* intangible assets contributing to a hotel's going-concern income." (*1300 Nicollet, L.L.C. v. Cty of Hennepin* (Minn. Tax Ct. Mar. 16, 2022) 2022 Lexis 12, 25, italics in original.) The City, however, does not contend the deduction of the management fees accounts for any and all nontaxable, intangible assets. Instead, it only contends the deduction of those fees captures the full value of the management agreement itself.

which prohibits an assessor from using the value of intangible rights and assets to enhance the value of taxable property." (*Elk Hills*, *supra*, 57 Cal.4th at p. 615.) As a result, the Strategic Plaintiffs, to successfully challenge the assessment, did not have "to provide credible evidence of *additional* intangible value subsumed in the [assessed] value of the" hotel, "such as evidence of unpaid or underpaid management or the existence of other intangibles."

Second, *SHC Half Moon Bay* does not help the City. The City is correct that this Division in *SHC Half Moon Bay*, *supra*, 226 Cal.App.4th at page 490, concluded that the hotel's management and franchise fees "capture[d] the intangible asset of goodwill." But in reaching this conclusion, this Division relied upon testimony in the record "demonstrating the [a]ssessor identified and quantified the value of goodwill in the amount attributed to the management and franchise fee." (*Id.* at p. 493.) By contrast, there is no evidence in this record that the Assessor separately or independently quantified the value of the management agreement in the amount attributed to the management fees. Instead, the Assessor formulaically deducted the management fees from the net operating income of the hotel with no further explanation or analysis. Absent evidence that the management agreement would generate no additional income beyond the management fees themselves, the Board could not remove the value of that agreement from the hotel's assessed value solely by deducting the fees from the hotel's estimated income stream.

In any event, *SHC Half Moon Bay* did not determine whether the assessed value of the hotel improperly subsumed the value of the management agreement itself. (See *SHC Half Moon Bay, supra,* 226 Cal.App.4th at p. 490 [only considering whether "the deduction of the

13

management and franchise fee from the hotel's projected revenue stream pursuant to the income approach did not . . . identify and exclude intangible assets such as the hotel's assembled workforce, the hotel's leasehold interest in the employee parking lot, . . . the hotel's agreement with the golf course operator," and "goodwill"].) Consequently, this Division has never considered the issue presented here—i.e., whether deduction of the management fees from the hotel's net operating income removed the full value of the management agreement itself from the hotel's assessed value.

Finally, in *SHC Half Moon Bay*, *supra*, 226 Cal.App.4th at page 485, this Division cited with approval the portion of the Assessors' Handbook that rejected the deduction of management fees as a method for excluding " 'the value attributable to the business enterprise that operates the hotel.' " This strongly suggests that we too would have rejected in *SHC Half Moon Bay* the method used here to remove the value of the management agreement from the assessed value.

Third, section 1610.8 does not compel a contrary conclusion. That section merely requires that "[t]he applicant for a reduction in an assessment . . . establish the full value of the property by independent evidence." (§ 1610.8.) It does not relieve the City of its duty, in assessing the hotel, "to value intangible assets and actively remove that value from [the hotel's] taxable base value, so that the intangibles are not directly taxed." (*Elk Hills*, *supra*, 57 Cal.4th at p. 608.)

Fourth, *SSL Landlord, LLC v. County of San Mateo* (2019) 35 Cal.App.5th 262 is inapposite. In that case, the taxpayer did not "present[] 'an intangibles case' " and did not produce any "evidence of quantified values of intangible assets." (*Id.* at p. 265.) Thus, the Court of Appeal held that "the Board properly found that [the taxpayer] had failed to meet its burden of

14

producing credible evidence of the quantified values of identified intangible assets that were impermissibly subsumed in the assessment value." (*Id.* at p. 271.) By contrast, the Strategic Plaintiffs did present an "intangibles case" and did produce evidence of quantified values of intangible assets allegedly subsumed within the assessed value of the hotel.

Fifth, the City's reliance on rule 8 is misplaced. Nothing in that rule suggests that "market-rate agreements for reasonably prudent management do not require an additional adjustment beyond the deduction of the management fee." To the contrary, no reasonable owner of a hotel would enter into a market-rate management agreement with reasonably prudent management unless that owner expected the agreement to generate more income than fees. (See *Olympic*, *supra*, 90 Cal.App.5th at p. 112; Advanced Appraisal, *supra*, at p. 162.)

Finally, the Board's increase of the capitalization rate from five percent to 5.25 percent does not make up for its use of a method that fails to account for the return on the management agreement. Although the Board claimed that it increased the capitalization rate, in part, "to further account for the value of the intangibles," this claim is belied by the record—which suggests that the quarter-point increase solely accounted for "risk." More notably, there is nothing in the record indicating that the quarter-point increase captured the full value of the management agreement or that the capitalization rate may be used to remove the value of a *particular* nontaxable, intangible asset from the assessed value of a property. (See Cal. Code Regs, tit. 18, § 313, subd. (e) ["The Board may act only upon the basis of proper evidence admitted into the record"].) Indeed, the Assessors' Handbook appears to foreclose such a use of the capitalization rate when it states that, under the income approach, the value of a particular nontaxable, intangible

15

asset should be removed either by deducting the income attributed to that asset from the net operating income *before* application of the capitalization rate or by deducting the value of the asset *after* the application of the capitalization rate. (See Advanced Appraisal, *supra*, at p. 163; see also *id.* at p. 165 ["The value of . . . nontaxable assets . . . must be removed from the income approach value either (1) by adjusting the income to capitalize or (2) by removing the value of the asset from the capitalized income value"].)

We therefore find that the method used by the City to remove the value of the management agreement from the assessed value of the hotel is legally erroneous. Accordingly, the City's assessment improperly subsumed at least a portion of the value of that agreement.[8]

## D. The Other Intangible Assets

The Strategic Plaintiffs also contend the assessed value of the hotel improperly subsumed the value of three other intangible assets: (1) cancellation/no show/attrition income; (2) in-room movies; and (3) guest laundry services. According to Plaintiffs, the net income generated by those assets should have been deducted from the hotel's net operating income under the income approach. The City counters that these deductions were not necessary because that income is "attributable to the [h]otel's real property" or because the asset does not directly contribute to the hotel's income.[9] We agree with the City that the cancellation/no show/attrition income is a taxable attribute of the property. We, however, agree with the

_____

[8] The Court expresses no opinion as to whether the Strategic Plaintiffs' proposed deduction of an additional 20 percent of the management fees from the net operating income of the hotel is proper.

[9] The City also argued that the deduction of fees or expenses associated with these intangible assets fully removed their value from the assessment. But we have already rejected this argument. (See, *supra*, at pp. 9–16.)

16

Strategic Plaintiffs that at least some of the net income from in-room movies and guest laundry services should have been deducted from the hotel's net operating income.

"Not all intangible rights must be deducted under an income approach to valuation." (*DFS Group, supra,* 31 Cal.App.4th at p. 1075.) "Inherent in the ownership of real property are the rights of possession and rights to use the property." (Advanced Appraisal, *supra,* at p. 155.) Consistent with this principle, section 110, subdivision (f) provides that the "intangible attributes of real property shall be reflected in the value of the real property. These intangible attributes of real property include zoning, location, and other attributes that relate directly to the real property involved." The value of these attributes may be included in the taxable value of real property because they "are an integral part of [the property] and effectively define it." (*Shubat v. Sutter County Assessment Appeals Bd.* (1993) 13 Cal.App.4th 794, 803 (*Shubat*).) The intangible attributes of real property do not, however, " 'include licenses, franchises, and other rights to do business that are exercised in connection with the use of the real property.' " (*Elk Hills, supra,* 57 Cal.4th at p. 620.) Indeed, "there is a fundamental difference between location, zoning, view, or architecture, and intangibles . . . that 'relate to the real property only in their connection with the business using it.' " (*Ibid.*)

Like the intangible attributes of real property, "intangible [assets or] rights that 'merely allow for the taxable property to generate income when put to its beneficial or productive use' . . . warrant no deduction." (*DFS Group, supra,* 31 Cal.App.5th at p. 1075.) This is because "the sole purpose" of that asset or right "is to enable the taxable property in question to function and produce income." (*Elk Hills, supra,* 57 Cal.4th at p. 619.) As a result, the asset or right has "only an 'indirect' contribution to income stream."

17

(*DFS Group*, at p. 1075.)  Thus, absent a basis for "attributing" to the asset or right "a separate stream of income related to enterprise activity" or "any separate stream of income," there is no "independent value" imputed to that asset or right "that would be deducted from the total income generated by the taxable property."  (*Elk Hills*, at p. 619.)

By contrast, "intangible assets and rights of the business operation utilizing the real property cannot enhance or be reflected in the value of the real property."  (Advanced Appraisal, *supra*, at p. 156.)  This is because those assets or rights "make a direct contribution to the going concern value of the business" (*Elk Hills*, *supra*, 57 Cal.4th at p. 618) and "relate to the real property only in their connection with the business using it" (*Shubat*, *supra*, 13 Cal.App.4th at p. 803).  For example, an intangible right "created by a private contract," like "the right to conduct a specified business operation[] in the conduct of a business entity's enterprise-related activities," is a nontaxable right "whose primary purpose is not to authorize a more productive use of taxable property."  (Advanced Appraisal, at p. 155.)

Here, the hotel's cancellation/no show/attrition income represents the value of an intangible attribute of the property:  the right to possess or use it.  Indeed, guests pay cancellation, no show, and attrition fees for the right to possess and use a hotel room during a specified period of time.  That the hotel receives those fees only when potential guests decline to exercise that right does not change the fact that the fees "relate *directly* to [the hotel's] real property"—i.e., its rooms.  (*Shubat*, *supra*, 13 Cal.App.4th at p. 803, italics added.)  The City therefore did not err by refusing to deduct the cancellation/no show/attrition income from the hotel's net operating income. (See § 110, subd. (f).)

18

The same, however, is not true for net income generated by in-room movies and guest laundry services. The right to provide those services at the hotel, like "[t]he right to sell duty-free goods" at an airport, "does not 'relate directly to the real property' [at the hotel] (§ 110, subd. (f)) . . . is not 'an integral part of [that property]' and does not 'effectively define it' (*Shubat*, *supra*, 13 Cal.App.4th at p. 803) . . . ." (*DFS Group*, *supra*, 31 Cal.App.5th at p. 1087.) Instead, the hotel's private contracts with third party vendors to provide these services to its guests establish "rights to do business that are exercised in connection with the use of the real property." (*Elk Hills*, *supra*, 57 Cal.4th at p. 620.) As a result, they are not taxable attributes of property. (See *DFS Group*, at pp. 1087–1088.)

Likewise, "the *sole* purpose of" in-room movies and guest laundry services is not to enable the hotel to "function and produce income." (*Elk Hills*, *supra*, 57 Cal.4th at p. 619, italics added.) Instead, these services generate a separate and identifiable stream of income for the hotel. In doing so, these services "make a direct contribution to the going concern value of the" hotel "as reflected in an income stream analysis." (*Id*. at p. 618.) Thus, they have "a quantifiable fair market value that must be deducted from an income stream analysis prior to taxation." (*Id*. at pp. 618–619.)

Accordingly, we find that the City erred when it failed to deduct any of the net income generated by in-room movies and guest laundry services from the hotel's net operating income in applying the income approach.[10] But the

---

[10] In reaching this conclusion, we do not decide what portion of the net income from in-room movies and guest laundry services should be deducted from the hotel's net operating income. (See *DFS Group*, *supra*, 31 Cal.App.5th at p. 1085 [assessor may consider, in determining the taxable value of a property, "the attributes of the property that make it favorable to" retail businesses operating at the hotel].)

19

City did not err when it declined to deduct the hotel's cancellation/no show/attrition income.

## E. Requests for Judicial Notice

The City's unopposed request to take judicial notice of portions of the Assessors' Handbook and the Strategic Plaintiffs' unopposed request to take judicial notice of portions of the Assessment Appeals Manual are granted. (See *Hunt-Wesson Foods, Inc. v. County of Alameda* (1974) 41 Cal.App.3d 163, 180 ["It is well established that assessor's handbooks are subject to judicial notice by the courts"].) The Strategic Plaintiffs' request for judicial notice of an unpublished superior court decision is denied. (See *Engine Manufacturers Assn. v. State Air Resources Bd.* (2014) 231 Cal.App.4th 1022, 1032, fn. 7 [declining to take judicial notice of unpublished superior court decision]; *Pereira-Goodman v. Anderson* (1997) 54 Cal.App.4th 864, 872, fn. 5 [declining to take judicial notice of superior court decisions because they "do not have precedential value"].) Likewise, their request for judicial notice of out-of-state cases is denied because those cases "are citable authority without the need for judicial notice." (*Randy's Trucking, Inc. v. Superior Court* (2023) 91 Cal.App.5th 818, 842, fn. 15.) Finally, their request for judicial notice of two articles from *California Tax Lawyer* is denied. (See *Bullock v. City of Antioch* (2022) 78 Cal.App.5th 407, 417, fn. 7 ["Law review and journal articles are not a proper subject of judicial notice"].)

## F. Conclusion

In assessing the hotel, the Board used a legally erroneous methodology that, by its nature, did not remove the full value of three nontaxable, intangible assets—the management agreement, in-room movies, and guest laundry services—from the taxable value of the hotel. Accordingly, "it is necessary to return this matter to the Board for a reassessment hearing."

20

(*DFS Group*, *supra*, 31 Cal.App.5th at p. 1088.)  In that hearing, "[t]he Board may reopen the record to allow the parties to present additional evidence on valuation of the intangible and possessory interests at issue." (*Id.* at pp. 1088–1089.)

## DISPOSITION

The trial court's judgment is affirmed in part and reversed in part, and the matter is remanded for further proceedings consistent with this decision. Costs on appeal are awarded to the Strategic Plaintiffs.

_____

Chou, J.

We concur:

_____

Jackson, P.J.

_____

Burns, J.

*SHR St. Francis LLC v. City and County of San Francisco* / A163847

A163847 / SHR St. Francis LLC v. City and County of San Francisco

Trial Court:Superior Court of San Francisco

Trial Judge:      Richard B. Ulmer Jr.

Counsel:     Greenberg Traurig; Colin W. Fraser, Cris K. O'Neall, and Ruben Sislyan, for Plaintiffs and Appellants.

David Chiu, City Attorney; Yvonne R. Mere, Chief Deputy City Attorney; Scott M. Reiber, Chief Tax Attorney; Frederick P. Sheinfield, Peter J. Keith, and Moneer H. Jamil, Deputy City Attorneys for Defendant and Respondent.